UNITED STATES of America,
Plaintiff-Appellee,

v.

Cecil Eugene HARRIS, a/k/a "Red" Harris, et al., Defendants-Appellants.

No. 71-3586
Summary Calendar.*

United States Court of Appeals.
Fifth Circuit.

May 22, 1972.
Rehearing Denied June 19, 1972.

See also 332 F.Supp. 315.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York, et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Emmett Colvin, Jr., Dallas, Tex., William J. Gillespie, Travis D. Shelton, Lubbock, Tex., for defendants-appellants.

Eldon B. Mahon, U. S. Atty., Fort Worth, Tex., Willis Taylor, Asst. U. S. Atty., Lubbock, Tex., for plaintiff-appellee.

Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.

AINSWORTH, Circuit Judge:

A jury found all six appellants guilty of illegal gambling in violation of 18 U. S.C. § 1955. In their appeal they assert the following four claims of error:

1.) That 18 U.S.C. § 1955 is an unconstitutional invasion by Congress on the powers reserved to the states by the Tenth Amendment of the United States Constitution;

2.) That the evidence was insufficient to sustain the convictions because there was no proof that five or more persons participated in the crime as required by 18 U.S.C. § 1955;

3.) That the Trial Court erred in overruling appellants' motion to sup-

press and limit evidence obtained pursuant to a warrant supported by an affidavit which was insufficient to establish probable cause; and

4.) That certain statements of appellant Harris were admitted into evidence in violation of appellant's Fifth and Sixth Amendment rights.

We find no merit in any of these contentions and the judgments of conviction are affirmed.

Appellants operated a gambling casino, known as The Redmen's Club, in Hockley County, Texas, where games of craps and blackjack were conducted. The operation was located in a house which, in addition to a kitchen and several smaller rooms, consisted of a game room where the gambling occurred and a dining room where the customers were served free meals and drinks. One witness described the operation as "just like Las Vegas." A large sign at the gate announced that the premises were operated under the auspices of a fraternal order known as "The Improved Order of Redmen, Seminole Tribe No. 7," which is a legitimate, nationwide organization originally chartered in 1906 by special act of the United States Congress, but which had no connection whatsoever with appellants' gambling activities. The club was open six nights a week and was in substantially continuous operation for a period in excess of thirty days. Appellants conducted the operation in a businesslike atmosphere. A bank account was maintained in a national bank for the purpose of paying employees of the club and paying various business and operating expenses. Insurance was maintained on the improvements to the real property where the club was located. Telephone service was supplied to the club by General Telephone Company of the Southwest under the listing of Improved Order of Red Men Lodge. Gas purchases were made from Plains Gas, Incorporated, under the account of I.O.R.M. Lodge. Numerous witnesses testified to the existence and nature of the gambling activities conducted. Gambling paraphernalia seized at the club was introduced into evidence at the trial of this cause.

Defendant Ronnie Jones was the manager of the club. He sold and bought chips, hired employees, furnished credit for customers, and signed invoices for the delivery of meat to the club.

Defendant Jackie Hawkins was a dealer in card games. He sold chips and signed invoices for delivery of meat to the club.

Defendant Cecil Harris greeted customers at the door. He cashed chips for customers and signed invoices for gas delivered to the club and lumber purchased by the club.

Defendant Phillip Wolfe was a dealer in the game room. He sold chips and had the right to authorize credit to the customers.

Defendant Houston Littlefield was a guard or watchman for the business. Littlefield was on the premises at all times. He lived there and used the premises for his domicile.

Defendant Marlin Bumpass was a dealer at the club. He arrived late and relieved other dealers. He dealt at the blackjack games and was stickman at the crap table every night, representing the house.

### I.

18 U.S.C. § 1955 IS NOT UNCONSTITUTIONAL, IN VIOLATION OF THE TENTH AMENDMENT, AND IS A VALID AND CONSTITUTIONAL EXERCISE OF CONGRESSIONAL POWER UNDER THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION.

Appellants complain that 18 U.S.C. § 1955,[1] pursuant to which they were con-

1. Pub.L. 91–452, Title VIII, § 803, Oct. 15, 1970, 84 Stat. 922 (The Organized Crime Control Act of 1970), 18 U.S.C. § 1955, provides in relevant part that

victed, is not an appropriate exercise by Congress of the power to regulate interstate commerce under Article I, Section 8 of the United States Constitution which gives Congress the power to regulate interstate commerce. The Supreme Court held in Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), that Congress must have a rational basis for finding that the chosen method is necessary for the protection of interstate commerce:

> "The activities that are beyond the reach of Congress are 'those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government.' Gibbons v. Ogden, 9 Wheat. 1, 195, 6 L.Ed. 23, 70 (1824). This rule is as good today as when Chief Justice Marshall laid it down almost a century and a half ago."

Id. at 302, 85 S.Ct. at 383. See also Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

■ Appellants assert that the legislative history of Section 1955 is barren of factual material that would support a finding of the requisite connection between illegal gambling per se and interstate commerce. Thus, they argue, the right to regulate such purely local gambling is expressly reserved to the states by the Tenth Amendment.[2] See, e. g., Kesler v. Department of Public Safety, etc., Utah, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962); Knapp v. Schweitzer, 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed. 2d 1393 (1958); Marshall v. United States, 9 Cir., 1966, 355 F.2d 999. We disagree.

Section 1955 is part of Title VIII of the Organized Crime Control Act of 1970. Section 801 of Title VIII of the Act states the following finding in unambiguous fashion:

> "The Congress finds that illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof."

Pub.L. 91–452, Title VIII, § 801, Oct. 15, 1970, 84 Stat. 922. Appellants contend that such "[p]erfunctory statements . . . cannot, alone, serve as the necessary rational basis for the statute," citing Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), where the Supreme Court examined in detail the economic, financial, and social setting as presented to Congress in numerous reports and hearings concerning the background of 18 U.S.C. § 891. A study of the legislative history of the Organized Crime Control Act of 1970, however, shows beyond question that Congress had ample evidence to support the finding announced in Section 801.

---

"§ 1955. Prohibition of illegal gambling businesses

"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

"(b) As used in this section—

(1) 'illegal gambling business' means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or posession of the United States."

2. The Tenth Amendment provides:
"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

In its Statement of Findings and Purpose made prior to the passage of the Organized Crime Control Act of 1970, the Congress declared and found among other things that "organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling. . . ." U.S.Code Cong. and Admin. News, 1970, p. 1073.

The Congressional Record is filled with evidence to support the conclusions, parts of which are set out in a footnote.[3] In a letter to Chairman Celler of the

---

3. In considering the passage of the Organized Crime Control Act of 1970 (S. 30), Congress had before it the 1967 Report of President Johnson's Commission on Law Enforcement and the Administration of Justice. Congressman Rodino of New Jersey related parts of the report to the House in its consideration of the bill:

"The Commission's Task Force on Organized Crime succinctly described the extent of the problem in its statement:

" 'Organized crime exists by virtue of the power it purchases with its money. The millions of dollars it can invest in narcotics or use of layoff money give it power over the lives of thousands of people and over the quality of life in whole neighborhoods. The millions of dollars it can throw into the legitimate economic system give it power to manipulate the price of shares on the stock market, to raise or lower the price of retail merchandise, to determine whether entire industries are union or nonunion, to make it easier, or harder for businessmen to continue in business.'

"In fact, as the Task Force report concludes:

" 'The purpose of organized crime is not competition with visible, legal government but nullification of it.' "
Cong.Rec., Vol. 116, No. 175, p. H 9656, Oct. 6, 1970. In concluding his statements, Congressman Rodino stated:

"Mr. Chairman, organized crime affects the lives of millions of Americans, yet operates outside the control of the American people and of our governments. Drastic methods to combat it are essential, and we must develop law enforcement measures at least as efficient as those of organized crime. With S. 30 we will provide not a panacea to rid the Nation of organized crime but the basis for an effective national program and generate a truly full-scale commitment to destroy the insidious power of organized crime groups. So while I have serious questions about some provisions of S. 30, I support it and urge its approval. It is an essential measure in the effort to eradicate the dreadful disease of organized crime that now afflicts the Nation."
Id.

Congressman St. Germain spoke in support of S. 30. He stated:

"The strong measures contained in this legislation are aimed at ridding our society of the highly profitable business of organized crime, and they are long overdue. Organized crime has been financially bleeding this country with increasing efficiency over a period of years. . . . Chairman Dante Fascell of the Government Operations Subcommittee on Legal and Monetary Affairs, of which I am a member, estimated the gross revenue of organized crime in this country at $60 billion. . . .

"Gambling is generally thought to be the most profitable of the illegal goods and services provided by the rackets and the syndicates. The President's Crime Commission reported in 1967 that enforcement officials believe that illegal betting on horse races, lotteries, and sporting events totals about $20 billion, with a net profit of $6 to $7 billion a year. If gambling is the most profitable of the rackets—and some believe loan sharking may be about equal with it—it is not the most lethal. The profits from gambling and usurious loans go into financing the deadly narcotics trade, and the profits here at the importing and wholesaling ends are as astronomical as is the cost paid for this traffic by society—in terms of human lives and the street crime motivated by the addicts' need for money to buy drugs.

. . . . .

"For example, I noted earlier that most of organized crime's profits are untaxed, but there are considerable overhead expenses. One of the most ominous statistics turned up by the President's Crime Commission in their surveys was the estimated $2 billion paid out each year by organized crime to public officials in and out of the criminal justice system to buy immunity from the law. Further, from fake bankruptcy suits to theft of Wall Street securities to 'partnership' in small and

House Committee on the Judiciary, who had requested the views of the Department of Justice on various provisions of the Organized Crime Control Act of 1970, the Department of Justice noted that Title VIII of the Act was properly predicated "squarely upon the tested and proven constitutional basis which the commerce clause affords" and that it was "directed solely to the objective of providing for more effective Federal prosecution of illegal gambling—the life-line of organized crime." U.S.Code Cong. and Admin.News, 1970, p. 4064. In the same letter it was stated that "Federal jurisdiction under title VIII rests upon specific findings of the Congress that illegal gambling, in diverse ways, involves the widespread use of interstate commerce, and affects interstate commerce." Id.

H.R.Rep.No.91–1549, accompanying Senate Bill No. 30 which was adopted as the Organized Crime Control Act of 1970, Pub.L. 91–452, contains the following statement with reference to Title VIII:

"The intent of section 1511 and section 1955, below, is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function."

large manufacturing companies, the syndicates are well represented in business and industries, alphabetically from automobile agencies to vending machines, in which organized crime is active, and indicated that this was only a partial list.

.    .    .    .    .

"Title VIII, Syndicated Gambling, would make large-scale gambling a Federal offense."

Id. at H 9656–57. Congressman McCullough noted that "Syndicated gambling is the mob's principal source of income, estimated at $7 billion a year. The interstate gambling enterprise could not function without the connivance and corruption of State and local officials in the obstruction of State laws." Id. at H 9657–58. Congressman McDade noted that "There are three major sources for all of this wealth, namely, gambling operations with a conservative estimated take of $20 billion annually and a $6 billion profit, most of it coming from those who can least afford to pay; loan sharking, $350 million per year; and narcotics, $350 million per year, almost all from the poor." Id. at H 9674. See also the remarks of Congressmen Fascell, H 9673; Halpern, Id. at H 9673; and Donohue, Id. at H 9674.

Congress sought through the Organized Crime Act of 1970 to eliminate a severe threat to the nation's well-being. Congressman Kleppe noted that "the threat of organized crime cannot be ignored or longer tolerated. It is America's principal supplier of illegal goods and services—gambling, usurious loans, illicit drugs, and prostitution; daily it increases its operation in fields of legitimate business, employing such illegitimate techniques as bankruptcy frauds, tax evasion, extortion, terrorism, arson and monopolization. Its sinister effects upon our Nation must be eradicated." Id. at H 9663. In a similar vein, Congressman Clancey stated that

"Organized crime today represents a serious threat to the well-being of this entire Nation. It is an evil which is gradually infiltrating and poisoning every phase of American life. It is corrupting our society, our economy, and our future. The money and power gained by the masters of organized crime is amazing. This illegal menace is entering into every phase of our lives. It drains countless dollars from our economy, it corrupts our free enterprise system and our democratic processes, and, in general, it undermines our entire Nation and our way of life."

Id. at H 9663. See also Report of the Senate Committee on the Judiciary, S.R. 91–617.

U.S.Code Cong. and Admin.News, 1970, p. 4029.

The case of Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), curiously relied upon by appellants, provides direct support for the Government's position. *Perez* involved a congressional finding of the interstate impact of "loan sharking" operations. The Supreme Court noted that Congress in seeking to regulate loan-shark activity found that extortionate credit transactions "are carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce." Id. at 147 n. 1, 91 S.Ct. at 1358 n. 1. Congress there found that "Even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce." Id. Congress's finding in Section 801 of Title VIII of the Organized Crime Control Act of 1970 is indeed similar. In *Perez*, the Court noted that Congress had before it a Report by the President's Commission on Law Enforcement and Administration of Justice which stated that loan sharking was "the second largest source of revenue for organized crime." Id. at 155, 91 S. Ct. at 1362. In the present case, Congress had before it evidence that illegal gambling profits were the principal source of revenue for organized crime. The Court in *Perez* upheld the constitutionality of Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891, even though the petitioner in that case was convicted solely for an act intrastate in character. The conviction was upheld on the authority of Congress to enact the criminal sanction based on its findings as previously noted. The case presently before us under Title VIII of the Organized Crime Control Act of 1970 is no different. Congress has here enacted legislation particularly suited to its finding that "illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof."

The power of Congress to legislate under the Commerce Clause of the Constitution "is not confined to the regulation of commerce among the states." United States v. Darby, 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609 (1941). It also extends to intrastate activities which affect interstate commerce to such an extent "as to make regulation of them appropriate means to the attainment of a legitimate end . . . ." Id. As Mr. Justice Jackson stated in Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942),

" . . . even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.' "

In legislating for a legitimate end under the Commerce Clause, Congress is not restricted to merely an economic definition of commerce but it may also legislate against matters considered to be "deemed a moral and social wrong." Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 257, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964). Indeed, Congress has the power "to declare that an entire class of activities affects commerce." Maryland v. Wirtz, 392 U.S. 183, 192, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968); United States v. Darby, supra, 312 U.S. at 120–121, 61 S.Ct. at 460. And, as stated by Mr. Justice Harlan in Maryland v. Wirtz, 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968).

"The contention that in Commerce Clause cases the courts have power to excise, as trivial, individual instances falling within a rationally defined class of activities has been put entirely to rest."

In Perez v. United States, supra, the Supreme Court found that extortionate credit transactions ("loan shark-

ing") fell into a rationally defined class of activities which Congress could regulate under the Commerce Clause. The Court stated, "Extortionate credit transactions, *though purely intrastate,* may in the judgment of Congress affect interstate commerce." 402 U.S. at 154, 91 S.Ct. at 1361 (emphasis supplied). Thus, such transactions were found to be subject to federal regulation. The same is true of illegal gambling. As defined in 18 U.S.C. § 1955, illegal gambling constitutes a rationally defined class of activities within congressional power to regulate under the Commerce Clause. See United States v. Darby, 312 U.S. at 120–121, 61 S.Ct. at 460, where the Court held the class of activities in *that case to be properly regulated* by Congress without proof that the particular intrastate activity against which a sanction was laid had an effect upon commerce. In *Perez,* the petitioner was found by the Court to be "clearly *a member of the class* which engages in 'extortionate credit transactions' as defined by Congress and the description of that class has the required definiteness." 402 U.S. at 153, 91 S.Ct. at 1361 (emphasis by the Court).

■■ Applying the above standards to the facts of this case, it can readily be seen that the appellants fall within a rationally defined class of activities which Congress has declared to have an adverse effect upon interstate commerce and has thus proscribed. Congress having thus regulated such class of activities, even if intrastate in character, the Act as applied to the appellants is constitutional. As stated by the Supreme Court in United States v. Wrightwood Dairy Co., 315 U.S. 110, 121, 62 S.Ct. 523, 527, 86 L.Ed. 726 (1942):

> "It is no answer to suggest, as does respondent, that the federal power to regulate intrastate transactions is limited to those who are engaged also in interstate commerce. The injury, and hence the power, does not depend upon the fortuitous circumstance that the particular person conducting the intrastate activities is, or is not, also engaged in interstate commerce. . . . It is the effect upon interstate commerce or upon the exercise of the power to regulate it, not the source of the injury which is the criterion of Congressional power."

Even so, the record in the present case conclusively shows the interstate ramifications of the gambling operations conducted by the appellants, in complete vindication of the judgment of the Congress. A broker from New Mexico brought clients of his business into Texas to appellants' gambling club for entertainment purposes. A resident of Tennessee at the instruction of one of the appellants wrote checks upon a national bank in Tennessee to pay his gambling losses incurred at appellants' establishment in Texas. Appellants maintained bank accounts in a national bank for the purpose of paying business expenses including withholding and Social Security taxes for their employees. A telephone was connected by an interstate communication carrier to the appellants' gambling establishment. Gambling losses were paid in United States currency which entered the flow of commerce. The evidence indicated the use, as a front organization, of a nationwide fraternal organization. Portions of the gambling paraphernalia seized indicated that it had moved in interstate commerce. Although, under the basic concept of the Commerce Clause such proof was not necessary, the evidence conclusively established the existence of that activity.

Congressman Poff, in explaining in definitive detail the titles of the proposed legislation on the floor of the House in speaking of Title VIII, stated:

> "Part A of the title contains a special finding that illegal gambling involves the widespread use of, and has an effect upon, interstate commerce and the facilities of interstate commerce. This finding is of substantive importance to the title because by creating a legislative jurisdictional base it makes Federal gambling investiga-

tions and prosecutions possible *without* the necessity of establishing an interstate nexus on a case-by-case basis."

Cong.Rec., Vol. 116, No. 176, p. H 9711 (emphasis supplied).

■■■■ Appellants' argument that enforcement of the Act infringes on the rights reserved to the states under the Tenth Amendment to the Constitution cannot be maintained with either conviction or plausibility. As stated in *Darby*, "From the beginning and for many years the [Tenth] amendment has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." 312 U.S. at 124, 61 S.Ct. at 462. The exercise of congressional authority under the granted power of the Commerce Clause for the permitted end of controlling illegal gambling as defined in 18 U.S.C. § 1955 is clearly constitutional. "It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states." United States v. Darby, 312 U.S. at 114, 61 S.Ct. at 457. The argument that the Tenth Amendment was violated by the conviction of the appellants is simply without any merit.

## II.

THE EVIDENCE WAS SUFFICIENT TO SHOW THAT FIVE OR MORE PERSONS PARTICIPATED IN THE GAMBLING OPERATION WITHIN THE MEANING OF 18 U.S.C. § 1955.

The gambling operation prohibited by 18 U.S.C. § 1955 must involve "five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; . . .." 18 U.S.C. § 1955(b) (1) (ii). Appellants contend that there is no evidence in the record which would even tend to support the proposition that appellants Bumpass and Littlefield conducted, financed, managed, supervised, directed, or owned all or part of the gambling operation. Thus it is argued that the convictions of all defendants must be set aside.

■■■■ Defendant Littlefield was a guard or watchman for the business. His duty was to admit people to the club. However, he had no discretion as to who was to be admitted. He was on the premises at all times, lived there and used the premises for his domicile. Bumpass was a dealer at the club. He arrived late and relieved other dealers. He dealt at the blackjack games and was stickman at the crap table every night representing the house. The thrust of appellants' argument is that Congress did not intend to include employees such as Littlefield and Bumpass as "persons who conduct, finance, manage, supervise, direct, or own all or part" of the gambling business and that mere employees cannot satisfy the necessary requirements. Appellants' contentions are not well taken.

■■■■ It was the express intent of Congress to include employees such as Bumpass and Littlefield within the definition of the word "conducts" as used in Section 1955. In the Report of The House Committee on the Judiciary, Report No. 91–1549, 91st Cong., 2nd Sess., which Committee reported favorably to the House of Representatives on the Organized Crime Control Act of 1970, that portion of the Report entitled Section Analysis discussing Title VIII of the Act, at page 53, defines the word "conducts" as follows:

"[This] section applies generally to persons who participate in the ownership, management, or conduct of an illegal gambling business. The term 'conducts' refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet."

U.S.Code Cong. and Admin.News, 1970, p. 4029.

Here, the Trial Judge carefully instructed the jury as follows:

" . . . a mere employee who has no ownership in such business and who is also without the power to conduct, fi-

nance, manage, supervise, or direct such business, could not be considered by you as one of the number of persons necessary to prove a violation of the federal statute under which these defendants are charged.

. . . . . .

"The word conduct means to operate, carry on, or cause to function."

■ We hold that the charge given was entirely adequate to present the factual issue to the jury. Moreover, the evidence presented to the jury was sufficient to convict all of the defendants under Section 1955. See also United States v. Palmer, 6 Cir., 1972, [Nos. 71–1596 and 71–1597, March 31, 1972].

## III.

THE AFFIDAVIT UPON WHICH A SEARCH WARRANT ISSUED FOR THE SEARCH OF THE GAMBLING CLUB WAS SUFFICIENT TO ESTABLISH PROBABLE CAUSE.

■ On March 11, 1971, a United States Magistrate executed a search warrant to search the Redmen's Club. The facts tending to establish probable cause for the issuance of the warrant were recited in the affidavit of Special Agent Robert M. Bryant of the Federal Bureau of Investigation. Appellants contend that the affidavit is insufficient under Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). A careful reading of the affidavit shows that appellants' contentions are devoid of any merit. See United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); United States v. Guinn, 5 Cir., 1972, 454 F.2d 29. See also United States v. Ventresca, 380 U.S. 102, 108–109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) and United States v. Squella-Avendano, 5 Cir., 1971, 447 F.2d 575.

## IV.

INCULPATORY STATEMENTS OF APPELLANT CECIL EUGENE "RED" HARRIS WERE NOT ADMITTED INTO EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

On May 17, 1971, Cecil Eugene "Red" Harris went to the office of Special Agent Leland Stephens of the Federal Bureau of Investigation to discuss a proposed gambling game at a forthcoming country club golf tournament and the application of the federal gambling statute to that proposed game. During the course of the conversation, Harris made certain inculpatory statements relative to the gambling activities at the Redmen Club.

Harris had been arrested by the FBI on the night of March 12, 1971. At approximately 2 a.m., Special Agent Ben Harrison attempted to interview Harris in a deputy's office at the Lubbock County Sheriff's Office. Before beginning the interview Agent Harrison identified himself and another agent who was present and orally warned Harris of his constitutional rights. In addition to the oral warning Harris was asked to read a Waiver of Rights form. The appellant looked at the form but did not sign it. He indicated to Agent Harrison that he did not wish to be interviewed and Harrison immediately terminated the attempted interview. At approximately 8:30 or 9 a.m. of the same day, all of the appellants were arraigned before a United States Magistrate. Once again Harris was advised of his rights by the Magistrate in the presence of his own counsel. Appellants were then released on bond. On May 10, 1971, after being indicted on April 17, 1971, the appellants, including Harris, were arraigned upon the indictment in the United States District Court for the Northern District of Texas, Lubbock Division. Harris was advised of his rights for a third time by the Honorable Halbert O. Woodward, United States District Judge.

On May 13, 1971, three days after the arraignment in the District Court, Special Agent Stephens was in Slaton, Texas, a small community approximately

fifteen miles from Lubbock, Texas, conducting a police school. At the lunch hour Agent Stephens went to the Citizens State Bank of Slaton to meet Tommy Wallace, president of the bank, to go with Mr. Wallace to the Rotary luncheon. While having a cup of coffee and waiting for Mr. Wallace to finish with a customer, Agent Stephens was approached by the appellant Harris who was also in the bank. Agent Stephens and Mr. Harris had known each other for nineteen years. Appellant Harris asked Agent Stephens if he could see him that afternoon. Agent Stephens told him that he was teaching at the police school and that he would be unavailable. Mr. Harris then inquired if he could see Agent Stephens the next day and he was again told that Stephens would be teaching at the police school. Harris then asked about seeing Agent Stephens some time during the next week. Agent Stephens told him he would be free on Monday and Mr. Harris suggested the time of 9:30. The following Monday, May 17, 1971, Mr. Harris appeared at the FBI office in Lubbock. This appearance was entirely voluntary. Mr. Harris was not in custody at the time, he was not under any type of restraint, nor was he under any compulsion to appear at the FBI office. Mr. Harris began his conversation with Agent Stephens by asking the agent if he would be in violation of federal law if he operated a gambling game at a forthcoming golf tournament. Agent Stephens told him that if the circumstances were such that such gambling might possibly violate federal law that the law would be enforced. Mr. Harris then volunteered the inculpatory statement concerning his operation of the Redmen's Club. At no time did

Agent Stephens question the appellant concerning the facts of this case, the arrest, the indictment, or any of the other defendants. No further statements were made concerning the Redmen's Club and the defendant and Agent Stephens discussed other matters. The entire conversation lasted about ten minutes.

■■■■■ A hearing was held on Harris's motion to suppress the statements. After the hearing the Court entered an order finding that such statement had been voluntarily made, that it was an unsolicited remark, and that it had not been made in response to any custodial interrogation. In essence Harris complains that Agent Stephens failed to administer proper *Miranda* warnings and that he "did not knowingly, clearly, and explicitly waive his right to counsel at this critical stage in the proceedings, and did not know or realize that his conversation could or would be used in court against him." However, as we recently stated in United States v. Trosper, 5 Cir., 1971, 450 F.2d 319, it is "well settled that an unsolicited remark by a defendant, not in response to any interrogation, does not fall within the rule of Miranda v. Arizona . . ." Id. at 320. See also United States v. Powers, 5 Cir., 1971, 444 F.2d 260. That is precisely what occurred in this case.

The judgments of conviction are affirmed.

### ON PETITION FOR REHEARING

**PER CURIAM:**

IT IS ORDERED that the petition for rehearing filed in the above entitled and numbered cause be and the same is hereby denied.[1]

---

1. In our original opinion we noted that House Report 91–1549, 91st Cong., 2nd Sess., contained the following explanation of the word "conducts":

   "The term 'conducts' refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet."

   See 1970 Code Cong. & Adm.News at p. 4029. Petitioners argue that the foregoing is contained within a paragraph of section analysis which discusses 18 U.S.C. § 1511 ("Obstruction of State or local law"), see House Report 91–1549, TITLE VIII, PART B. 1970 Code Cong. & Adm.News at pp. 4028–29, and that the word "conducts" has a different meaning as used in Section 1955. A close reading of the House Report shows that Congress intended the word "conducts" to have the same meaning in each instance. See 1970 Code Cong. & Admin. News at pp. 4028–4030.