**UNITED STATES of America,**
**Plaintiff,**

v.

**18 GAMBLING DEVICES, Defendant.**

**Civ. A. No. 4275.**

United States District Court,
S. D. Mississippi, S. D.

Aug. 28, 1972.

Charles T. Sykes, Jr., Gulfport, Miss., for defendant.

Robert E. Hauberg, U. S. Atty., Jackson, Miss., for plaintiff.

## OPINION OF THE COURT

DAN M. RUSSELL, Jr., Chief Judge.

On October 5, 1971, the government filed an in rem complaint for the forfeiture of 18 gambling devices seized by agents of the Federal Bureau of Investigation from the Beehive Lounge, Gulfport, Mississippi. The government alleges that these devices, having an appraised value of more than $2500.00, were being used in violation of 18 U.S.C. § 1955(a) and are subject to forfeiture under 18 U.S.C. § 1955(d) because said devices were being used in the operation of an illegal gambling business. A warrant of arrest issued and the devices were taken into the custody of the United States Marshal for this District, who, under order of this Court, published public notice for any claimants to interpose their claims to the property on or before December 3, 1971.

Prior to the filing of this action, James W. Ware, in Civil Action No. 4214 on the docket of this Court, styled James W. Ware v. United States of America, filed a motion for the return of some 23 amusement devices, including the 18 devices involved in the case sub judice, allegedly seized by F.B.I. Agents on July 1 and 2, 1971, and a motion to suppress, alleging that the seizure was unlawful in that Ware was engaged in a sole proprietorship and his business was not in violation of federal or state laws. The government admitted the seizure of the devices, denied that they were for amusement purposes only, and denied that petitioner had stated a cause of action. Petitioner moved for a temporary, interlocutory and permanent injunction to restrain the Attorney General of the United States, the U. S. District Attorney and the Marshal for the Southern District of Mississippi from forfeiting or destroying said devices. Meanwhile, Cause No. 4275 having been filed, Ware moved to consolidate. In Cause No. 4214 the Court, upon being advised that Ware had failed to post the required bond as to 5 of the devices the respec-

tive value at each location where seized having a value of less than $2,500.00, found that Ware had apparently failed to exhaust his administrative remedies as to them. The Court, accordingly, denied the motion to consolidate, directing that Cause No. 4214 be dismissed as to the 18 devices inasmuch as they are the same ones involved herein, and that Ware show cause as to why No. 4214 should not be dismissed as to the remaining 5 devices because of the administrative forfeiture. In an order filed in both cases on March 13, 1972, Cause No. 4214 was dismissed with the right retained to Ware to renew herein his motion to suppress. Cause No. 4214 is not involved in this decision.

On April 11, 1972, Ware filed his answer claiming to be the sole owner of the 18 devices described in the complaint, conceding their value to be in excess of $2,500.00. He denied that they are gambling devices, denied that they were being used in violation of any federal or state laws, and denied that they are subject to forfeiture. Affirmatively Ware alleges that said devices were legally and lawfully purchased and were used as amusement devices only.

The action was tried to the Court.

Section 1955(a)(b) and (c), Title 18 U.S.C. provides:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, book-making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established."

Section 1955(d) provides in part:

"(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States."

Section 2047 of the Mississippi Code of 1942 reads in part:

"It shall be unlawful for any person or persons, firm, copartnership, or corporation to have in possession, own, control, display, or operate any cane rack, knife rack, artful dodger, punch board, roll down, merchandise wheel, slot machine, pin ball machine or similar device or devices. * * * Provided, however, that pin ball machines which do not return to the operator or player thereof anything but free additional games or plays shall not be deemed to be gambling devices, and neither this act nor any other act shall be construed to prohibit same."

The government also contends Ware violated Section 2190 of the Mississippi Code which provides a fine for any person who encourages, promotes or plays

at any game, play or amusement, for money.

The devices seized by the government include 11 Bally type pinball machines and 7 slot machines described as follows:

Bally Venice, S/N VE–316
Bally Big Show, S/N E–4690
Bally Can Can, S/N A–1208
Bally Safari, S/N SI–1131
Bally Folies Bergeres, SN FB–623
Bally Carnival Queen, S/N C–4413
Bally Miami Beach, S/N 4528
Bally Bikini, S/N A–1061
Bally Venice, S/N VE–355
Bally Border Beauty, S/N BR–453
Bally Safari, S/N SI–39
Bally Jumbo, S/N 719
Keeney's Twin Big Tent, S/N P–2900
Keeney's Twin Deluxe Big Tent, S/N KP–1717
Keeney's Summertime, S/N Kest–462
Keeney's Twin, S/N P–1040
Hialeah, S/N 608
Keeney's Twin Big Tent, S/N P–2710

Ware admitted that in 1971 he was engaged in the business of furnishing coin-operated pool tables, "juke" boxes and pinball machines to various restaurants and lounges along the Mississippi Gulf Coast for amusement purposes only, and for which he paid an amusement tax levied by the State of Mississippi. He admitted that some of his pinball machines had been placed at four establishments, Lonnie's Place, Fran's Place, Paul and Mary's Reef Lounge and the Horseshoe Lounge. He admitted that during the period June 30, 1971, to July 2, 1971, F.B.I. agents confiscated pinball machines from various lounges including three lounges where Ware had machines. Ware maintained that although there was a division of the profits from the pinball machines between himself and the lounge operator, he neither participated in nor agreed to pay-offs to customers, nor did he have any employees, nor did the lounge operators have any employees. He also contends that none of the machines seized on locations are involved herein, it being undisputed that at the time the machines were seized, all were located in Ware's warehouse, 1824 30th Ave., Gulfport, Mississippi, formerly known as the Beehive Lounge, including seven slot machines, none of which had been placed on location, but from the time of their purchase, had remained in the warehouse.

The government relied on evidence from four sources: (1) individuals who operated business establishments where Ware had placed Bally pinball machines; (2) Special Agents of the F.B.I. who played Bally pinball machines at these locations; (3) expert witnesses who had analyzed one of the pinball and one of the slot machines; and (4) records belonging to Ware showing the locations of these devices from time to time during 1971 and up until July 2, 1971, when they were seized at his warehouse.

1. *The lounge operators*

Mary Louise Douthit operated Paul and Mary's Reef Lounge, Pass Road, Gulfport, Mississippi, for seven days a week from March to October 1971. In April Ware placed in her lounge two Bally pinball machines which remained there until removed by Ware on or about June 27, 1971. Her customers played the machines and she paid 5¢ for each game won, called "payouts." She testified that a meter on the machine registered the number of games played, and that when a customer won, she paid him his winnings equal to 5¢ a game, and then pushed a button under the machine called a "knock-off" button, which reduced the games to zero, and made the machine ready for new games. She stated that Ware came by once a week, reimbursed her for her pay-outs and they split the remainder 50-50. She stated that Ware at no time ever instructed her not to pay off on the machines. She also admitted that, after the machines had been removed from her place, she, at Ware's request, gave a statement to Ware's attorney that she had never made any pay-outs on these machines. Her testimony at the trial was to the contrary.

Mrs. Frances M. Dennison ran Fran's Cafe seven days a week during 1970–71.

In February or March 1971 Ware put two pinball machines in her place where they remained until they were seized by the F.B.I. on June 30, 1971. She made pay-outs to her customers for winning games. Ware came by once a week, opened the machines to read the meter, reimbursed her for pay-outs and they split the balance. After she made pay-outs, she too flipped a knock-off button to take the winning games off the score board. She also admitted giving a statement to Ware's attorney but did not remember what was in it.

From 1960 to August 1971, Mrs. Anne Evelyn Finch was the owner of the Horseshoe Lounge, Long Beach, Mississippi, open seven days a week. Ware put two Bally pinball machines in her place in February 1971. He removed one on or about June 30, 1971. She, as well as the other location operators, had no key to get into the machines. Ware alone removed the money from the coin boxes. He reimbursed her for the money she paid out to customers who won and then split the balance with her. She erased the games that were paid off on by hitting the knock-off switch underneath the machine. She also identified a meter that registered how much was paid out. She too was asked to sign a statement that she did not make pay-outs, but at the trial she admitted this statement was not true.

Lawny P. Ferrill, operator of Lonnie's Place, Gulfport, testified that he operated a pool room six days a week. In early 1970 he had two of Ware's pinball machines which were picked up by the F.B.I. in November 1970. He had two more until the end of June 1971. He too made pay-outs on these machines. Ware collected the money personally and after paying Ferrill for his pay-outs, Ware split the balance with Ferrill. Ferrill also gave a statement to Ware's attorney that Ware had nothing to do with the pay-outs, but at the trial, Ferrill said Ware certainly knew about them.

## 2. F.B.I. Agent testimony

Leon E. Anderson, a special agent with the F.B.I., testified that on May 22, 1971, at about 7 p. m., he went to Paul and Mary's Reef Lounge for the purpose of winning on the pinball machines. He identified two Bally type machines to the left of the door as he entered. He played one, bearing the name of Bally Beauty Beach, putting in $3.00 until he won 20 games. He did not play the free games, but, on his request was given $1.00 by the barmaid. She also knocked-off his score by hitting the knock-off button. On May 21, 1972, between 4 p. m. and 5 p. m., Anderson went to Lonnie's Place for a similar purpose. Four pinball machines were located there. He played one called a Bally Zodiac, and, after inserting $2.00 in nickels, won 20 games. A bartender named Jimmie checked his score, paid him $1.00 and activated the knock-off button. This agent testified that he had played approximately 150 pinball machines throughout Mississippi, winning on over 100. He was refused a pay-out only twice—once in Greenwood and once on the Gulf Coast at a place called Woodie's Bar in downtown Gulfport.

Special Agent Grant Beise went to the Horseshoe Lounge on June 3, 1971, where he saw two pinball machines. He played one, identified as a Bally Golden Gate. He inserted nickels totaling $3.50 and won 60 games. A bartender named Tom checked his score, paid the agent from the cash register, and switched the knock-off button. The agent identified the other machine as a Bally Venice. On June 1, 1971, before noon, this agent played a Bally Venice at the Postman's Lounge in Gulfport. He won 60 games after putting nickels totaling $1.00 in the machine; he requested and received $3.00 for his winning games. The barmaid activated the knock-off switch. He identified the machine he played as the same as one located outside the courtroom, bearing the Serial No. VE–355, this also being one of the 18 machines

seized at Ware's warehouse. Beise said he spent about two months during the summer of 1971 playing pinball machines at 105 different locations in Mississippi, about 35 or 40 on the Gulf Coast, and that he was refused a pay-out at only three places, none on the coast.

Special Agent Calvin Uhlig went to Lonnie's Place to play pinball machines on June 29, 1971. He identified the machine he played as a Bally Zodiac, Serial No. 2 D–282. He used $8.55 to get a pay-out of $1.00 on 20 games that he won. A bartender checked his score, paid him from the cash register and punched the knock-off button. On June 4, 1971, Uhlig went to Fran's Place. He used $3.15 in nickels to win 40 games on a Bally Folies Bergeres, and was paid from the cash register by a man who checked Uhlig's score and pushed the knock-off button. Uhlig stated that a player next to him received $40.00 for winning 800 games. It cost the player $32.00 to win this amount. Uhlig also saw Ware come in and collect money from the coin boxes of three pinball machines in the premises. This same agent testified that he visited the B & B Drive Inn on June 1 and 28, 1971. On June 1 he spent $2.75 inserting coins in a Bally Safari before winning 20 games. The bartender checked his score, pushed the knock-off button and paid him $1.00. Two other agents were with Uhlig. They had difficulty reading the serial number on the back of the machine, but identified it as SI–39. On June 28, Uhlig again played a Bally Safari using $3.-25 to win 20 games and was paid off as before.

On July 2, 1971, Uhlig identified himself as one of several agents who, armed with a search warrant, seized the 18 machines at Ware's warehouse, formerly the Beehive Lounge. Although the seizure was made during daylight hours, the warehouse was dark inside and it was difficult to see the serial numbers on the machines. Nonetheless the agents made an inventory, listing the serial numbers. They attached a pink notice of seizure on each machine with the date and the initials of one of the agents. Ware's attorney and the owner of the building were present at all times. Ware came later and was told by the agents that the machines had been seized and were not to be moved. A day or so later, the agents had the seized machines removed to government storage. In moving a Bally Safari, it was determined that the Serial No. was SI–69, not 39. This machine was introduced into evidence during the trial, still bearing the agent's initials and the seizure notice.

### 3. *Records belonging to Ware*

Special Agent Jerry R. Parker participated in the seizure of the 18 machines at the warehouse on July 2, 1971. The day before he had made arrangements with Ware's attorney to inspect Ware's records. From these records, the agent copied a list of machines showing Ware's inventory as of January 1971. Other records showed where the machines were located, the dates they were on location, when they were removed, and those that had been returned to the warehouse at the end of June, including seven seized, as follows:

| Placed at Location | Make and Serial No. | Removed to Warehouse |
|---|---|---|
| 4/16/71–B & B Drive Inn | Bally Safari SI–39(69) | 6/28/71 |
| 2/5/71–Fran's Cafe | Bally Bikini A–1061 | 4/7/71 |
| 5/21/71–Fran's Cafe | Bally Carnival Queen C–4413 | 5/27/71 |
| 2/3/71–Horeshoe Lounge | Bally Venice VE–316 | 6/27/71 |
| 5/2/71–Postman's Lounge | Bally Venice VE–355 | 6/24/71 |
| 1/10/71–Lonnie's Place | Bally Folies Bergeres FB–623 | 6/29/71 |
| 3/3/71–Lonnie's Place | Bally Safari SI–1131 | 6/28/71 |

The remaining machines, consisting of 4 Bally pinball machines and 7 slot machines, were reflected on Ware's records as being at the warehouse where they were found and seized. The agent also copied a bill of sale showing that Ware had purchased the slot machines on June 1, 1971 for cash. Ware's records revealed other machines which had either been previously seized by the F.B.I. or were not found. Copies of these records were placed in evidence. Other than Ware's own testimony that he placed the pinball machines, along with "juke" boxes and pool tables, at various locations for amusement only, and that he had no agreement with the operators of these establishments for pay-outs to customers, Ware undertook through a field representative and special agent of the Mississippi State Tax Commission, Jack Patton, to show that he, Ware, had paid state amusement taxes on the pinball machines as well as the music and pool table devices. Patton testified that at one time during 1971, the Sheriff of Harrison County, Mississippi, had announced that there were no pinball pay-outs in the county. On the basis of this announcement, Patton said he was instructed to license such machines as the owner said were intended for amusement purposes only and that he sold three such licenses to Ware and issued stickers for Ware to put on the licensed machines. These licenses were introduced into evidence by Ware. Patton admitted that there was no way to tell from the licenses themselves which machines were involved, and that no field checks were made on Ware's machines after the licenses were issued, and that he personally did not know if Ware paid off on the pinball machines.

### 4. *Expert testimony*

Special Agents James D. Fraleigh and Patrick W. Paddock testified as to the characteristics of the Bally pinball machines and electronic slot machines, respectively, each demonstrating a machine in the courtroom. Both men are assigned to the F.B.I. laboratory in Washington, D. C. Fraleigh has a degree in electrical engineering and considerable experience in space systems. He spent the last six months prior to the trial in analyzing and inspecting over 100 pinball machines of the Bally type. He had made schematic drawings of their component parts, compared the machines with the manufacturers' drawings, is familiar with the operators' manuals, and has particularly analyzed the electric circuitry. Using the Bally Safari SI–69 for demonstration purposes, Fraleigh activated the machine by the insertion of coins and went through each phase of its operation. According to Fraleigh, all Bally pinball machines have identical or similar component parts, with parts being interchangeable. With this in mind, the Court adopts a digest of Fraleigh's testimony as prepared by the government in its proposed findings of fact, as follows:

"The Bally 'bingo' pinball machines are coin-activated, electrically operated machines representing various models which have no significant physical distinctions, manufactured by Bally Manufacturing Corporation, Chicago, Illinois. The machines when assembled and ready for use, consist of a vertical section attached to a base section to which are secured four legs. The base section contains a glass-covered playboard having 20 or 25 numbered holes and one "ball-return" hole which is inclined toward the front of the machine. In the base section are 8 metal balls, and a spring-loaded plunger with which to propel the balls onto the playboard. Affixed to the playboard are lighted spring bumpers and stationary bumpers located generally over each hole or near each hole. The bumpers are fixed bumpers with no moving parts. The arrangement of holes and bumpers substantially reduces player control of the ball after it has been propelled onto the playboard and produces in long-term play a predictable distribution pattern of ball placements. The exterior of the base contains coin slots to accept nickels and/or quarters and several buttons used in playing the

machine. The vertical section, which houses most of the mechanical and electrical components of the machines, has a decorated front referred to as a back-glass. The back-glass is divided generally into four areas: scores (commonly referred to as odds), features, scorecard, a game selection feature, and a replay register. The *scores* relate to the number of replays which the player may possibly win. A player can win from 4 to 600 replays, depending upon the advancement of the electrically lighted sections behind the score section of the back-glass. *Features* refer to game advantages which may be obtained and relate to the ability to reposition numbers on the scorecard. The *scorecard* contains an arrangement of numbers from 1 to 20 or 1 to 25, depending upon the number of holes on the playboard. Locations of the balls which are lodged in the numbered holes on the playboard are indicated by lighted section of the scorecard. The *game selection feature* refers to an alternate game which may be played while playing the regular 5-ball game. The game selection feature has a separate set of scores on the backglass which apply to winning combinations of ball placements for this feature. The *replay register* is either a 3-digit counting meter or a 4-digit counting meter. The replay register appears as if it will record only 899 or 1,999 free games respectively. The object of play of the defendants is to propel the balls by means of the plunger onto the inclined playboard so that the ball will fall into certain holes and thereby light corresponding light bulbs located in the vertical sections of the machines. When three or more bulbs are lit in a row, or in some other predetermined order, the machine registers so-called free plays, depending upon the scores which are lighted on the vertical section. The machines are played in *two basic steps*. The *first* step involves one or more *activations of* the machines' *electrical circuitry* by deposit of one or more coins (or use of replays available). Activation of machine circuitry during this first step is at the rate of a nickel per activation, or a replay when available for activation. This step determines the replay award schedule or *scores* (odds) which will apply to play of that game and the features of number of winning combinations which will be available for play. The attainment of *game advantages*, such as advanced scores and additional features over the minimum guaranteed at the start of each game, is determined by electrical and mechanical parts of the machine in a chance manner over which the player has no control. The machines are so constructed that any number of coins may be inserted therein before actual play of the game begins. The number of replays to be awarded for successful operation of the machine can be increased by insertion of additional coins prior to play of the machine, although the rate of increase of replay awards cannot be controlled by the player and may or may not increase upon the insertion of a particular coin. The player may also attempt to gain *additional features* above the guaranteed minimum and, as in the case of the advancement of scores, the advancement of features is dependent upon the chance mechanism of the machine called the mixer unit and spotting disk. The obtaining of features and/or scores from the machines' activation initiated by the insertion of coins or the use of replays is dependent upon the completion of electrical circuits through the interaction of mixer and spotting disk. Activation of these units by insertion of coins or use of replays results in a designed and calculated scrambling of the machines' circuits in the selection of various scores and various features in a chance manner over which the player has no control. The chance that a player will obtain scoring advantages for each coin or replay used, such as advanced scores or additional features, changes with the increase or decrease in the number of circuits available through the mixer. The machines have a governor built into them called the *reflex unit* which adjusts the chances of obtaining advanced scores

and/or features, depending upon the previous history of the machine. When replays are won and recorded on the replay register the reflex unit operates in such a manner that circuits are removed. The reflex unit operates in a manner to restore circuits upon each activation of the machine by either coin or replay. However, the circuits are restored by the reflex unit at a slower rate than the circuits are removed. After the player of the machines had obtained the desired advancement in scores and features he begins the second step of play. The *second step in playing* the machines involves propelling the balls onto the inclined playboard by means of the spring-loaded plunger. The 5 balls are propelled out onto the playboard in the play of each regular game. Each ball that falls into a numbered hole is retained in that position until the completion of ball play. Successful placement of balls in holes which light three, four, or five numbers in the same color section of the scorecard (adjacent numbers in an "in-line" model), or other winning combinations as may be indicated by lighted features on the backglass, entitles the player to replays in accordance with score (odds) schedules obtained in Step One. The ball descent in the inclined playboard is totally dependent upon the law of gravity and chance contacts with the bumper posts affixed to the board. The actual distribution of the balls in the holes follows a chance pattern more strongly oriented toward certain favored holes but nonetheless having a probability greater than zero of falling into any given hole which is a manifestation that the playboard itself introduces an element of chance with the play of the machine. Machines have *tilt circuits* which are adjustable and are designed to minimize player control as a factor in the placement of balls on the playboard. Replays won on the machine are recorded on the *replay register.* The replay so recorded may be used by depressing appropriate buttons on the front of the horizontal section of the machine to activate the mechanism which controls the increase of replays referred to above as scores, or to activate other features of the machine. Each such use decreases the number of replays shown on the replay register by one. The replay register can be immediately cleared by operation of an on-off switch located on the bottom side of the base section of the device. This on-off switch is commonly referred to as the "knock-off button." Inside the base section is located a meter which registers the number of free games so eliminated. Other internal meters located in the base section record total play of the machine and the money deposited in the machine."

■ The Court finds on the basis of this testimony and that of the lounge operators that the Bally pinball machines are devices designed and manufactured primarily for use in connection with gambling, and that those operating or playing the machines may become entitled to receive money as a result of an application of the element of chance. Further, the machines involved herein had been so wired that the knock-off meters functioned so as to record only those free games which were knocked-off, and for which payment was made, and that Ware was able to read the knock-off meters in order to determine the amount of reimbursement to the lounge operators.

Agent Paddock, with two degrees in forensic science and thirteen years' experience in making mathematical examinations of criminal evidence, including gambling equipment such as slot machines, involving chance and probabilities, testified that he examined the slot machines which were seized, and activated six of them. As to the Keeney Deluxe Big Tent, Serial No. KP-1717, which he demonstrated in the courtroom, he testified that prior to the trial, he played the machine 1000 times, activating the play with the insertion of nickels; that he kept records of the results, and that these results manifested the element of chance. He identified the drums or reels on which insignia are

displayed, the chance alignment of which determines wins. He also identified two meters, one recording the total games played, the other the games knocked-off after wins were paid off.

■ Although Ware has not attacked the constitutionality of Section 1955, Title 18, U.S.C., it is just as well to say that this statute has been held to be constitutional. United States v. Harris et al., 460 F.2d 1041, 5th Cir. 1972; United States v. Sacco et al., D.C., 337 F.Supp. 521, and United States v. Aquino et al., D.C., 336 F.Supp. 737.

Other decisions have held that Bally pinball machines are gambling devices. See United States v. Various Gambling Devices, N.D. of Miss., 340 F.Supp. 1200, 1972; and United States v. Bally Manufacturing Corporation et al., E.D. of La., 345 F.Supp. 410, 1972. This Court finds that the expert's analysis of the way these machines operate proves conclusively that they were manufactured for the intended purpose of gambling, and that Ware's use of these machines constituted a gambling business.

■ The Court further finds that a preponderance of the evidence related above shows that Ware's gambling business in the use of the pinball machines and his ownership of the slot machines constituted an illegal gambling business in violation of the laws of the State of Mississippi.

In United States v. Harris, supra, the Court found the evidence therein was sufficient to show that five or more persons participated in the gambling operation within the meaning of 18 U.S.C. § 1955. The Court quoted from the legislative history of the statute showing that the word "conducts" is defined as follows:

"This section applies generally to persons who participate in the ownership, management or conduct of an illegal gambling business. The term 'conducts' refers both to high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet."

The ordinary meaning of the word "conduct", that is, to operate, carry on, or cause to function, would include the participation, not only of Ware, but the lounge owners and their employees. The proof is insurmountable that the proprietors of at least six lounges, and their employees, participated with Ware in the pay-outs.

Ware's own records, as well as the testimony of the lounge operators, show that his machines were in these locations in continuous operation for more than thirty days.

Ware admitted that the machines when seized at the warehouse were of a value in excess of $2,500.00 and therefore subject to this forfeiture procedure.

■ As stated in the first part of this opinion, the right to renew his motion to suppress was reserved to Ware in this action. He not only failed to file or press such a motion, but he never at any time prior to or during the trial moved to exclude his records which he permitted the F.B.I. agents to examine and copy. In his post-trial brief he raises for the first time the issue of self-incrimination by objecting to the use of records he was *required* to keep. He apparently was under the impression that he was required to keep records pursuant to the Gambling Devices Act of 1962, 15 U.S.C. § 1171 et seq. involving the registration of gambling devices. He was registered for the calendar year 1971 under the Act, but if this Court's recollection of Ware's testimony is correct, none of the machines involved herein had been registered with the Internal Revenue Service, and none bore a federal gambling stamp. Be that as it may, the evidence is clear that these records were voluntarily turned over to government agents in the presence of Ware and his attorney. No objections having been made prior to or during the trial, the Court finds that Ware knowingly and voluntarily waived any right to object to the introduction of them into evi-

dence. He admitted in his pleadings that he owned the devices and he freely testified as to their various locations. The records added nothing more.

The Court finds that the government has proved that Ware conducted a gambling business in violation of Section 1955, 18 U.S.C.A., and as provided in that statute, the property so used, including money, was properly seized and should be forfeited. This property includes the 11 Bally pinball machines and the 7 slot machines seized under the warrant of arrest, and any money or moneys in them.

An appropriate order may be submitted.