UNITED STATES of America,
Plaintiff-Appellee,

v.

Louis B. PACHECO and John N. Fountain, Jr., Defendants-Appellants.

No. 72–3355.

United States Court of Appeals,
Fifth Circuit.

Feb. 8, 1974.

Rehearing and Rehearing En Banc
Denied March 7, 1974.

Arnold Levine, Tampa, Fla., for defendants-appellants.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Bernard H. Dempsey, Jr., Claude H. Tison, Jr., Asst. U. S. Attys.. Tampa, Fla., for plaintiff-appellee.

Before GEWIN, AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

Appellants Louis B. Pacheco and John N. Fountain, Jr., were indicted, along with fifty-eight other persons, in a two-count indictment charging them with operation of an illegal gambling business, in violation of 18 U.S.C. §§ 1955 [1] and 2,[2] and with conspiracy to operate an il-

---

1. 18 U.S.C. § 1955 provides in relevant part:
§ 1955. Prohibition of illegal gambling businesses
(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
(b) As used in this section—
(1) "illegal gambling business" means a gambling business which—
(i) is a violation of the law of a State or political subdivision in which it is conducted;
(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.
(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

. . . . .

2. 18 U.S.C. § 2 provides:
§ 2. Principals
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

legal gambling business, in violation of 18 U.S.C. § 371.[3] All those indicted were allegedly participants in the same illegal gambling organization involving bookmaking and numbers operations in Florida. By the date set for trial, fifty-two of the defendants entered pleas of guilty to one or both counts, and only four defendants were left for trial.[4] After a two-week jury trial, verdicts of guilty on both counts were returned as to three of the defendants, including appellants here. The fourth defendant was found guilty on count II but was acquitted on the conspiracy charge contained in count I. Appellant Pacheco was placed on a three-year probation, and appellant Fountain was sentenced to six months in jail plus a five-year probation. Appellants do not contest the sufficiency of the evidence presented at trial to support their convictions; rather, they raise several issues concerning the trial court's rulings on certain motions and on particular matters of evidence. After careful consideration of their assertions of error, we affirm appellants' convictions.

## I

For federal jurisdiction to exist over the operation of an illegal gambling business, in violation of 18 U.S.C. § 1955, it is necessary to show, *inter alia,* that the business "involve[d] five or more persons" in its conduct, financing, management, supervision, direction, or ownership. 18 U.S.C. § 1955(b)(1)(ii). Because of this jurisdictional require-

ment, appellants, relying on Wharton's rule, *see* page 558, *infra,* contend that it was improper to charge them with both the substantive offense of operating an illegal gambling business and a conspiracy to commit that offense; and that the trial court, therefore, erred in denying their motions to dismiss count I of the indictment, which charged a violation of 18 U.S.C. § 371. While Wharton's rule, properly applied, may occupy a legitimate place in the criminal law,[5] it would be inappropriate to apply it in the present situation.

■ It is fundamental that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses", Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961); Pinkerton v. United States, 328 U.S. 640, 643, 66 S. Ct. 1180, 1182, 90 L.Ed. 1489 (1946), and a person may ordinarily be convicted of and sentenced for both. Pinkerton v. United States, 328 U.S. at 643, 66 S. Ct. at 1182. Conspiracy is a separate offense on the theory that collective criminal agreement presents greater antisocial potentialities than criminal activity pursued by individuals. *See, e. g.,* W. LaFave & A. Scott, Jr., Criminal Law 459–60 (1972); Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 923–24 (1959). "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminali-

3. 18 U.S.C. § 371 provides:
 § 371. Conspiracy to commit offense or to defraud United States.
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maxi-

mum punishment provided for such misdemeanor.

4. One defendant had died, the case as to another had been dismissed, and the case as to the remaining two had been severed for trial at a later date.

5. *But see* Model Penal Code § 5.04, Comment, at 173 (Tent.Draft No. 10, 1960):
 The rule is supportable only insofar as it avoids cumulative punishment for conspiracy and the completed substantive crime, for it is clear that the legislature would have taken ·the factor of concert into account in grading a crime which inevitably requires concert.

ty." Callanan v. United States, 364 U.S. at 593, 81 S.Ct. at 325.

Wharton's rule affords a narrowly limited exception to the principle that conspiracy, as well as the substantive offense, may be prosecuted. That rule, as stated by the commentator whose name it bears, provides that "when to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a nature that it is aggravated by a plurality of agents, cannot be maintained." 2 F. Wharton, Criminal Law § 1604, at 1862 (12th ed. 1932). The classic situations in which the rule is said to apply are dueling, bigamy, adultery, and incest. *Id.* The apparent rationale of the rule is that it is grossly unjust to punish two parties for the commission of a crime and for combining to commit the crime when the combination is an inherent element of the substantive offense. *See* R. Anderson, 1 Wharton's Criminal Law and Procedure § 89 (1957); Developments in the Law—Criminal Conspiracy, *supra,* at 953–56. In the case law, the rule has been applied almost exclusively to instances in which the object of the alleged conspiracy was a two-party crime, such as the giving and receiving of bribes, United States v. Dietrich, 126 F. 664 (C.C.D.Neb.1904); People v. Wettengel, 98 Colo. 193, 58 P.2d 279 (1935), or the buying and selling of contraband goods, United States v. Katz, 271 U.S. 354, 355, 46 S.Ct. 513, 70 L.Ed. 986 (1926) (dictum). The rule has been held not to apply when the number of conspirators exceeds the number of participants essential to the contemplated crime. *See, e. g.,* United States v. Iannelli, 3 Cir., 1973, 477 F.2d 999, 1002 (18 U.S.C. § 1955); United States v. Becker, 2 Cir., 1972, 461 F.2d 230, 234

(18 U.S.C. § 1955); Baker v. United States, 9 Cir., 1968, 393 F.2d 604, 610, cert. denied, 393 U.S. 836, 89 S.Ct. 110, 21 L.Ed.2d 106; Old Monastery Co. v. United States, 4 Cir., 1945, 147 F.2d 905, 907–908, cert. denied, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 437.[6]

■ In asking us to apply Wharton's rule to the section 1955 situation, appellants misconceive the import of that section's jurisdictional requirement that five or more persons be involved in the illegal gambling business. Such jurisdictional requirements are unrelated to the criminal character of the conduct and should be separately treated. *See, e. g.,* United States v. Blassingame, 2 Cir., 1970, 427 F.2d 329, 330, cert. denied, 402 U.S. 945, 91 S.Ct. 1629, 29 L. Ed.2d 114 (1971); Overton v. United States, 5 Cir., 1968, 405 F.2d 168, 169; Pipes v. United States, 5 Cir., 1968, 399 F.2d 471, 472, cert. denied, 394 U.S. 934, 89 S.Ct. 1207, 22 L.Ed.2d 464 (1969); Pilgrim v. United States, 5 Cir., 1959, 266 F.2d 486, 488.

■ In enacting the Organized Crime Control Act of 1970, of which section 1955 is a part, Congress directed its attention to large-scale, syndicated gambling because it was thought that "organized crime derives a major portion of its power through money obtained from such illegal endeavors as [inter alia] syndicated gambling . . . ." 1970 U.S.Code Cong. & Admin.News p. 1073. As its jurisdictional basis for making organized gambling prosecutable in a federal court, Congress relied on its power to regulate interstate commerce. Section 1955 was drafted to prohibit only those gambling businesses that reach a size and scope certain to have significant interstate impact. *See* United States v. Harris, 5 Cir., 1972, 460 F. 2d 1041, cert. denied, 409 U.S. 877, 93

6. *See generally* United States v. Bobo, 4 Cir., 1973, 477 F.2d 974, 985–986:

The cases decided on the issue of what constitutes an unindictable conspiracy reveal that Wharton's rule, rather than being a rule, is a concept, the confines of which have been delineated in widely diverse

fashion by the courts. Practically the only point of agreement among the cases which have considered the issues is the validity of the rule as applied to the crimes listed by Wharton in enunciating the rule. Those were: dueling, bigamy, incest and adultery.

S.Ct. 128, 34 L.Ed.2d 130. The section contains a jurisdictional statement—separate from the statement of prohibited conduct—that defines "illegal gambling business" as a business that involves five or more persons and that either is in continuous operation for more than thirty days or has a gross revenue of $2,000 in any single day. 18 U.S.C. § 1955(b)(1). Through this jurisdictional statement, Congress sought to confine federal attention to large-scale organized gambling, which clearly has direct effects on interstate commerce. It is apparent, therefore, that participation by a group of persons was included as a jurisdictional element in section 1955 for reasons wholly separate from those that explain the presence of concerted activity as a substantive element in the traditional Wharton's rule crimes.

Section 1955 left the states with control of enforcement efforts against smaller gambling operations that did not meet the minimum jurisdictional requirements, though such businesses might be identical to the others in every respect except size: "The intent of section 1511 and section 1955, below, is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions."[7] Thus, in its section 1955 jurisdictional statement, Congress was making no distinctions between the conduct prohibited by section 1955 and that conduct not within its scope. The activity proscribed by section 1955 is not a unique offense distinguishable in its substantive elements from the crime of operating an illegal gambling business involving less than five persons—or for that matter, involving one person.

Wharton's rule is applicable only when more than one party is necessary to perform the basic crime. It prevents prosecution for conspiracy only where the proscribed type of conduct cannot take place without such concert of action. The basic conduct prohibited by section 1955, however—the operation of an illegal gambling business—does not require concert of action. It is not, therefore, a proper subject for the application of Wharton's rule. The trial court properly denied appellants' motions to dismiss the conspiracy count of the indictment. *See* United States v. Bobo, 4 Cir., 1973, 477 F.2d 974, 985–987; Note, Wharton's Rule and Conspiracy to Operate an Illegal Gambling Business, 30 Wash. & Lee L.Rev. 613 (1973). *See also* United States v. Iannelli, 3 Cir., 1973, 477 F.2d 999, 1002; United States v. Becker, 2 Cir., 1972, 461 F.2d 230, 234.[8]

## II

Appellants next contend that the trial court erred in denying their motions for severance of the conspiracy count and the substantive count or for an election of counts on which trial would proceed. Having disposed of their contention, *supra,* that the two counts charged the same offense, their further claim is not and could not be that there was a misjoinder of counts in the indictment such that relief under Rule 8 of the Federal Rules of Criminal Procedure would be appropriate.[9] Rather, appellants con-

---

7. H.R.Rep.No.91–1549, accompanying Senate Bill No. 30, which was adopted as the Organized Crime Control Act of 1970, Pub.L. 91–452, U.S.Code Cong. & Admin.News 1970, p. 4007.

8. In United States v. Hunter, 7 Cir., 1973, 478 F.2d 1019, 1026, the court held that "a charge of conspiracy to violate § 1955 may not be maintained if it comprehends nothing more than the agreement which those persons necessarily performed by the commission of the substantive offense itself." We think it clear, however, that the record before us substantiates an aggravation of criminality, not essential to the substantive offense, that resulted from the illicit agreement among the defendants.

9. Rule 8 of the Federal Rules of Criminal Procedure provides in full:

Joinder of Offenses and of Defendants

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are

tend that the joint trial of the counts confused the jury and so prejudiced appellants that they should have been granted relief under Rule 14 of the Federal Rules of Criminal Procedure. We do not agree. ·

 Rule. 14 provides that, *inter alia,* an election of counts may be ordered or separate trials granted if either the Government or the defendant can show that prejudice would result from a joinder of offenses or of defendants for trial.[10] The boundaries of Rule 14 were recently delineated by this Court in Tillman v. United States, 5 Cir., 1969, 406 F.2d 930, 934–935, vacated as to one defendant on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742:

> The existence of prejudice, in large measure, depends upon the facts and circumstances of each case, Flores v. United States, 5 Cir., 1967, 379 F.2d 905, 909; Blachly v. United States, 5 Cir., 1967, 380 F.2d 665, 675; Peterson v. United States, 5 Cir., 1965, 344 F.2d 419, 422, and it is axiomatic that the granting of a severance is within the discretion of the trial judge. Smith v. United States, 5 Cir., 1967, 385 F.2d 34, 37. The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed on review. 8 Moore, Federal Practice ¶ 14.02 [1], p. 14–3 (2d ed. 1968). The defendant

must show something more than the fact that "a separate trial might offer him a better chance of acquittal." Id. at ¶ 1404 [1], pp. 14–10—14–11, citing Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Robinson v. United States, 1954, 93 U.S.App.D.C. 347, 210 F.2d 29. See also Johnson v. United States, 8 Cir., 1966, 356 F.2d 680; Butler v. United States, 8 Cir., 1963, 317 F.2d 249; Smith v. United States, 1950, 86 U.S. App.D.C. 195, 180 F.2d 775. [Footnote omitted.]

*See also* United States v. DeSapio, 2 Cir., 1970, 435 F.2d 272, 280, cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L. Ed.2d 166 (1971).

 The showing of prejudice is, we think, particularly difficult in the situation before us, in which the counts joined charge a substantive offense and a conspiracy to commit that offense. *See, e. g.,* James v. United States, 5 Cir., 1969, 416 F.2d 467, 474, cert. denied, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970); Milam v. United States, 5 Cir., 1963, 322 F.2d 104, 110, cert. denied, 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181 (1964); United States v. Branan, 6 Cir., 1972, 457 F.2d 1062, 1066.[11] The relationship between the two counts is quite apparent, and the evidence required to establish the substantive offense is included, to a large extent, in the evidence

---

based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

10. Rule 14 of the Federal Rules of Criminal Procedure provides in full:

Relief from Prejudicial Joinder

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or

information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

11. *See also* Model Penal Code § 5.03(4), Comment, at 135 (Tent.Draft No. 10, 1960):

In the case of complex and far-flung networks of crime, such a presentation [in one trial of all aspects of the entire scheme] may be essential to an understanding of the entire operation and the role played by each participant . . . .

necessary to establish the conspiracy count. We cannot say that the trial judge abused his discretion in denying appellants' motion for severance or election. *See, e. g.*, West v. United States, 5 Cir., 1962, 311 F.2d 69, 70; United States v. Friedman, 9 Cir., 1971, 445 F. 2d 1076, 1081–1082, cert. denied, 404 U. S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275; United States v. Barrow, 3 Cir., 1966, 363 F.2d 62, 67, cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967); Allen v. United States, 7 Cir., 1924, 4 F.2d 688, 698–699, cert. denied, 267 U.S. 597, 45 S.Ct. 352, 69 L.Ed. 806 (1925).

## III

The evidence for the case against the sixty original defendants, including appellants, was developed in large measure by the Florida Department of Law Enforcement (FDLE) prior to the entry of the United States into the investigation and prosecution. The major portion of the evidence consisted of conversations intercepted by FDLE agents in a series of wiretaps of the telephones of various defendants. In each instance, the intercept was instituted pursuant to an order issued by Justice James C. Adkins of the Florida Supreme Court, upon application authorized by the Governor of

Florida, Reuben Askew. The last intercept was that on the telephone of William Fox [hereinafter referred to as "Fox tap"]. It was instituted at approximately the same time the United States Attorney agreed to take over the prosecution of the case.

In the court below, appellants moved to suppress the illegal wiretaps, but no relief was granted. In this Court, appellants make five arguments against the legal validity of the interceptions. We can find, however, no infirmity in the admission in evidence of the wiretaps.

Section 2516(2) of Title 18, United States Code, permits the "principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a [state] statute," to apply "to a State court judge of competent jurisdiction" for an order permitting a wire interception.[12] No interception order can be issued by a state court judge unless the wiretap may provide evidence of an offense specified in section 2516(2): "murder, kidnapping, gambling [inter alia] . . . ." The corresponding section of Florida's wiretap statute is modeled after, and largely adopts the exact phrasing of, section 2516(2).[13]

12. 18 U.S.C. § 2516(2) provides in full:
(2) The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or

other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.

13. *See* Fla.Stat. § 934.07, F.S.A.:
§ 934.07 Authorization for interception of wire or oral communications
The governor, the department of legal affairs, or any state attorney or any county solicitor having jurisdiction to prosecute felonies in his respective jurisdictions may authorize an application to a judge of competent jurisdiction for, and such judge may grant in conformity with this chapter, an order authorizing or approving the interception of wire or oral communications by the department of law enforcement or any law enforcement agency of this state or any political subdivision thereof having responsibility for the investigation of the offense

Appellants' first three contentions with respect to the admission of the intercepts relate to these excerpted portions of the federal wiretap statute. Their fourth argument in this regard involves the investigative procedures attempted prior to the wiretaps; and their final contention challenges the constitutional validity of the federal statute pursuant to which the intercepts were authorized.

### A

Florida has chosen to implement the requirement in the federal statute that the principal prosecuting attorney make application for the wiretap order, by designating, among others, the Governor of the state to authorize initial applications for interceptions. *See* Fla.Stat. § 943.07, F.S.A., reproduced at note 13 *supra.* Appellants contend, however, that the chief executive officer of the state is not within the contemplation of the federal statute authorizing the "principal prosecuting attorney" of the state to make initial approval.

The purpose of including this requirement in the federal statute was not to designate a particular officer by name or title but to ensure the centralization of policy decisions of this type at the highest practicable levels, preferably on a statewide basis. In the

words of the Senate report explaining section 2516(2):

> In most States the principal prosecuting attorney of the State would be the attorney general. The important question, however, is not name but function. The intent of the proposed provision is to provide for the centralization of policy relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officer of the State. Who that officer would be would be a question of State law. Where no such office exists, policymaking would not be possible on a statewide basis; it would have to move down to the next level of government.

Senate Report No. 1097, 1968 U.S.Code Cong. & Admin.News pp. 2112, 2187. Appellants are in the position of complaining that they received too much protection rather than too little, because it was the governor, not the attorney general or state attorney, who authorized the wiretaps involved here. We reject their argument.[14] The determination that is to be made by the state official designated in accordance with the federal statute is whether a particular proposed use of monitoring techniques is consistent with the state's overall policy in this area. In such matters of policy,

---

as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling (when the same is of an organized nature or carried on as a conspiracy in violation of the laws of this state), robbery, burglary, grand larceny, prostitution, criminal usury, abortion, bribery, extortion, dealing in narcotic drugs or other dangerous drugs, or any conspiracy to commit any violation of the laws of this state relating to the crimes specifically enumerated above.

14. Appellants urge that United States v. Robinson, 5 Cir., 468 F.2d 189, remanded on rehearing en banc, 5th Cir., 472 F.2d 973 (1973), stands for a strict reading of section 2516(2). That case involved improper delegation, in the name of the Attorney General of the United States, to inferior Justice Department officials of the power to authorize

wiretap applications. The wiretap in question was found invalid under section 2516(1), which provides that the Attorney General or any specially designated Assistant Attorney General may authorize wiretap applications. *Robinson* provides no support for appellants' contention. The Court's reading of section 2516(1) is consistent with the language of that subsection because the subsection specifically names the officials concerned. In section 2516(2), on the other hand, Congress left to the state statutory schemes the task of designating appropriate officials. Furthermore, in *Robinson*, the issue was whether someone inferior to the Attorney General could perform the function of approving wiretap applications; here, the question is whether his superior may do so. Whereas in *Robinson* appellants were deprived of proper guarantees owed them, appellants before us received more protections than required by statute.

the governor represents the state and is superior to all prosecuting attorneys of the state. Florida's designation of its governor to determine the propriety of applications for federal interceptions comports fully with the federal requirements and ensures the safeguards for which the statute is designed.

### B

■ Appellants next assert that the wire intercepts are invalid because Justice Adkins, who authorized them, is not a "State court judge of competent jurisdiction," as required by statute. 18 U. S.C. § 2510(9)(b) defines a "State court judge of competent jurisdiction" as "a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of wire or oral communications." By state statute, Florida has defined "judge of competent jurisdiction" as a "justice of the supreme court, judge of a district court of appeal, circuit judge, or judge of any court of record having felony jurisdiction of the state . . . ." Fla.Stat. § 934.02(8), F.S.A.[15] Appellants suggest, however, that under the Florida Constitution, the Florida Supreme Court has no general criminal jurisdiction in criminal matters and that it can act only in an appellate capacity and only with respect to certain criminal cases. They contend that the language of the federal statute is meant to encompass only judges of circuit courts and criminal courts of record in Florida and that, therefore, a justice of the Florida Supreme Court, such as Justice Adkins,

has general criminal jurisdiction only when assigned by the chief justice of the state to sit as a circuit judge.[16] There is no merit to these contentions.

The Florida Constitution empowers the chief justice to assign justices and judges of the state courts to judicial service in any other state court of the same or lesser jurisdiction. Fla.Const. art. V, § 2, F.S.A. It is clear, therefore, that the constitution, not the particular designation of assignment by the chief justice, confers general criminal jurisdiction on the justices of the supreme court.[17]

■ We note, moreover, that with respect to section 2510(9)(b) Senate Report No. 1097 points out that the former practice of allowing United States Commissioners and city mayors to issue search warrants was "too permissive for the interception of wire or oral communications." 1968 U.S.Code Cong. & Admin.News p. 2179. In acting on its concern with guaranteeing "responsible judicial participation in the decision to use these techniques", *id.*, Congress obviously did not intend to specify the particular state courts that could issue wiretap orders; instead, it described the quality of public officials who should pass upon such matters. Florida has responded most appropriately to the wishes of the Congress by including the justices of the Florida Supreme Court among those judicial officers authorized to issue wiretap orders.

### C

As previously noted, "gambling" is one of the offenses for which an inter-

---

15. 18 U.S.C. § 2510(9)(b) empowers both federal district and court of appeals judges to issue wiretap orders. Appellants contend, in effect, that only state trial court judges can issue wiretap orders.

16. During the period of the intercept orders, Justice Adkins received two assignments to sit as a judge of another court, on one occasion as a trial judge and on the other as an appellate judge.

17. Florida Statutes § 934.07, F.S.A. authorizes interception orders for precisely the same

list of offenses, and in the same order, as section 2516(2), except that five additional offenses are included in the state statute. Intercept orders for gambling offenses may be issued under the state statute only "when the same is of an organized nature or carried on as a conspiracy in violation of the laws of this state." *See* note 13 *supra.* A federal order may issue when a violation of section 1955 is indicated. *See* 18 U.S.C. § 2516(1)(c).

ception order can be issued by a state court judge.[18] The applications and orders issued in this case all recite that the proposed intercepts may provide evidence of the violation of Florida Statutes § 849.09, F.S.A., which makes it unlawful to conduct a lottery.[19] Appellants argue that conducting a lottery is not gambling within the meaning of the Florida wiretap statute. They insist that the only Florida statutes dealing with gambling are section 849.08, which penalizes anyone who plays "in any game at cards, keno, roulette, faro or other game of chance," and section 849.14, which punishes anyone who engages in sports wagering. We reject appellants' assertions.

Chapter 849 of the Florida Statutes, F.S.A., in which sections 849.08 and 849.14 are contained, is styled "Gambling" and treats, *inter alia*, lottery, keeping of gambling houses, bookmaking, and manufacturing of gambling devices. Nowhere in the chapter is there a definition of gambling or the offense of gambling. We think it clear, therefore, that "gambling" is used in its generic sense and comprehends any otherwise qualifying activity—including conducting a lottery—described in any of the various portions of Chapter 849. *See* Creash v. State, 131 Fla. 111, 179 So. 149 (1938).

Appellants make one additional argument with respect to the offenses charged in the indictment. 18 U.S.C. § 2516(2) permits states to use wiretap investigation only if the interception may provide evidence of one of the enumerated offenses *and* the offense is punishable by imprisonment for more than one year. Appellants point out that not all the offenses charged in the indictment carry a sentence of more than one year and claim that, therefore, the inter-

ceptions are invalid. We disagree. Additional offenses discovered during the course of a proper intercept may be prosecuted regardless of the nature of the offense or the prescribed punishment.

**D**

Section 2518(1)(c) of Title 18, United States Code, requires that each application for an intercept order include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . . " Appellants contend that the trial court erred in admitting the results of the Fox tap in evidence because the prosecutor intentionally suppressed information required by section 2518(1)(c) to be included in the application for the wire interception. We, however, can find no such error.

One of the principal witnesses for the United States at the trial was Mrs. Beverly Roberts Matthews, who, for a number of years prior to 1971, had been closely associated with Harlan Alexander Blackburn, a major defendant in this case. Mrs. Matthews had previously been convicted of perjury as a result of certain testimony given in an effort to shield Blackburn in another prosecution. United States v. Roberts, 5 Cir., 1971, 455 F.2d 930. While the appeal from her perjury conviction was pending, Mrs. Matthews began supplying information about Blackburn's operation on a confidential basis to the Federal Bureau of Investigation. Appellants claim that her availability as a witness should have been disclosed in the application for the Fox tap because this would have shown that normal investigative techniques were sufficient to develop the case.

18. Other than limiting the offense of gambling to instances in which it is done in an organized manner, neither the federal nor the Florida wiretap statutes define gambling.

19. Florida Statutes § 849.09, F.S.A. makes it unlawful to promote, conduct, set up, adver-

tise, assist, attempt to operate, possess any equipment or tickets for, sell or assist in the sale of tickets for, or possess any advertising for any lottery or lottery drawing.

We are satisfied that there is no basis for appellants' argument that Mrs. Matthews' identity or her information should have been supplied in the FDLE's application for the Fox tap. Mrs. Matthews' identity and information were known only to the United States, which was unaware of the Fox tap application until after it had been made and approved. As the district court pointed out:

> For, had it been known to those involved in the organized criminal activity that she had been "talking" to the F.B.I., her life would have been seriously endangered. . . . Her situation was so sensitive that it would have been unconscionable for [the FBI agent] to have disclosed her name and the information she was giving to the F.D.L.E. or anyone else during the pendency of the monitoring in question.

United States v. Lanza, M.D.Fla., 1973, 356 F.Supp. 27, 29.

 Prior to the Fox tap, moreover, there was no reason to suppose that Mrs. Matthews' information was sufficient for purposes of complete investigation of this case. In no realistic sense could it be said that Mrs. Matthews had information that would eliminate, or, in some instances, even lessen, the need for the Fox tap. Without the Fox tap, there would have been at least seven defendants who would not have appeared in the case at all, and the sole evidence as to several others would have been the uncorroborated testimony of an accomplice previously convicted of perjury. Finally, we note that the purpose of the requirement in section 2518(1)(c) is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques. United States v. King, S.D.Cal., 1971 335 F.Supp. 523, 535; Senate Rep. No.

1097, 1968 U.S.Code Cong. & Admin. News pp. 2112, 2190.

### E

 Appellants make one final challenge to the admission in evidence of all the wiretaps by claiming that section 1955 is unconstitutional and that, therefore, no interception to detect a violation of the statute could lawfully be authorized pursuant to section 2516. This Court has previously considered and rejected this argument in United States v. Harris, 5 Cir., 1972, 460 F.2d 1041, 1043–1049, cert. denied, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130, in which the challenge to the validity of the federal wiretap statute was made directly. There we held that section 1955 is a valid and constitutional exercise of congressional power over interstate commerce. *Accord*, United States v. Becker, 2 Cir., 1972, 461 F.2d 230, 233–234; Schneider v. United States, 8 Cir., 1972, 459 F.2d 540, 541–542, cert. denied, 409 U.S. 877, 93 S.Ct. 129, 34 L.Ed.2d 131. *See also* United States v. Thaggard, 5 Cir., 1973, 477 F.2d 626, 630; United States v. Palmer, 6 Cir., 1972, 465 F.2d 697, 699, cert. denied, 409 U.S. 874, 93 S.Ct. 119, 34 L.Ed.2d 126.

### IV

Mrs. Matthews furnished information to an FBI agent on a score or more occasions, and the information she supplied was recorded on the standard FBI interview report, Form FD 302. The interview reports relating to her trial testimony comprised almost 100 pages, all of which were furnished to defense counsel before Mrs. Matthews testified.

 Two or three of the interviews with Mrs. Matthews were so lengthy and comprehensive that the interviewer, to ensure completeness and accuracy, recorded the conversations on tape and later made notes from the original recordings. From the tapes and these original notes, he then dictated notes that were later transcribed on the inter-

view reports ultimately furnished to defense counsel. The tapes were then erased. Appellants urge that the Government's failure to retain the original tapes, or to prepare transcripts of them, for production to the defense at trial as Jencks Act statements constitutes a violation of the Jencks Act, 18 U.S.C. § 3500. Appellants contend that the trial court therefore erred in denying their motion to strike Mrs. Matthews' testimony. We find no substance in their claim.

■■■ Nothing in the Jencks Act requires that notes made in the course of an investigation be preserved after the notes have served their purpose of assisting in the preparation of interview reports. United States v. Jones, 2 Cir., 1966, 360 F.2d 92, 95, cert. denied, 385 U.S. 1012, 87 S.Ct. 721, 17 L.Ed.2d 549 (1967); United States v. Hoffa, 6 Cir., 1965, 349 F.2d 20, 47–48, aff'd on other grounds, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Alexander v. United States, 1964, 118 U.S.App.D.C. 406, 336 F.2d 910, cert. denied, 379 U.S. 935, 85 S.Ct. 336, 13 L.Ed.2d 346. Similarly, the tape recordings made in this case were clearly not within the scope of the Jencks Act. In fact, the Form FD 302 interview reports did not become "statements" subject to production under the Act until Mrs. Matthews examined their content and confirmed that they were accurate. See Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); Palermo v. United States, 360 U.S. 343, 350–353, 79 S.Ct. 1217, 1223–1225, 3 L.Ed.2d 1287. The procedures followed in this case prior to that time assured that the reports turned over to the defense were more complete and accurate than they otherwise might have been. See Rosenberg v. United States, 360 U.S. 367, 370–371, 79 S.Ct. 1231, 1233–1234, 3 L.Ed.2d 1304 (1959); Killian v. United States, 368 U.S. 231, 243–244, 82 S.Ct. 302, 309, 7 L.Ed.2d 256. See also James v. United States, 5 Cir., 1969, 416 F.2d 467, 476, cert. denied, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970); Posey v. United States, 5 Cir., 1969, 416 F.2d 545, 557, cert. denied, 397 U.S. 946, 90 S.Ct. 965, 25 L.Ed.2d 127 (1970).

V

Appellants urge four final claims of error by the trial court: (1) that the results of a polygraph examination taken by appellant Fountain should have been admitted in evidence; (2) that the instructions to the jury with respect to the credibility of witnesses and the essential elements of count II were confusing; that the instruction to the jury on "similar transactions" was improper in light of the date of enactment of section 1955; (3) that the trial court erred in admitting in evidence testimony of crimes committed by codefendants that were not related in any way to the charge herein; also testimony by Mrs. Matthews with respect to acts of violence committed by certain of the defendants that were unrelated to the charges on trial; and guns and similar paraphernalia seized from defendants who were not on trial; (4) that government counsel should not have been permitted to make a "prejudicial and inflammatory closing argument."

■■■ Under the circumstances presented, we cannot say that the trial court erred in refusing to admit the results of the polygraph test taken by appellant Fountain. See, e. g., United States v. Francis, 5 Cir., 1973, 487 F.2d 968, 972; United States v. Chastain, 7 Cir., 1970, 435 F.2d 686, 687; United States v. Wainwright, 10 Cir., 1969, 413 F.2d 796, 802–803, cert. denied, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1970); United States v. Tremont, 6 Cir., 1965, 351 F.2d 144, 146, cert. denied, 383 U.S. 944, 86 S.Ct. 1198, 16 L.Ed.2d 207 (1966); McCroskey v. United States, 8 Cir., 1965, 339 F.2d 895, 897. After a thorough review of the record, moreover, it is clear to us that appellants' other assorted contentions are groundless.

We have examined all of appellants' assertions and have found them to be without merit. Accordingly, the judgment below is affirmed.