552 F.2d 605
 54 A.L.R.Fed. 578
 UNITED STATES of America, Plaintiff-Appellee,
v.
Alfredo Fernandez "Chino" "Al" ALFONSO, Steve Guggino, Frank
Fraterrigo Vega, Louis Henry "Dr.", "Bacardi" Figueredo,
Sr., Sam Vaglica and Sam Castellano, Jr., and Henry "Mr.
Garcia", "the Man" Trafficante, Defendants-Appellants.
 No. 75-3564.
 United States Court of Appeals,
Fifth Circuit.
 May 19, 1977.
Rehearing and Rehearing En Banc June 15, 1977.
Rehearing Denied July 11, 1977.
 
 1
 Bennie Lazzara, Jr., Anthony F. Gonzalez, Tampa. Fla., for Alfonso.
 
 
 2
 Thomas J. Hanlon, III, Tampa, Fla. (Court appointed), for Guggino.
 
 
 3
 Virgil M. Wheeler, Jr., New Orleans, La., Henry Gonzalez, Tampa, Fla., for Trafficante.
 
 
 4
 Ralph W. Rinehart, Tampa, Fla. (Court appointed), for Vega.
 
 
 5
 Everett Q. Jones, Tampa, Fla. (Court appointed), for Figueredo.
 
 
 6
 John S. Matthews, Tampa, Fla., for Vaglica and Castellano.
 
 
 7
 John L. Briggs, U. S. Atty., Jacksonville, Fla., Robert J. Erickson, Vincent R. Alto, Sp. Atty., Mervyn Hamburg, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.
 
 
 8
 Appeals from the United States District Court for the Middle District of Florida.
 
 
 9
 Before BROWN, Chief Judge, AINSWORTH, Circuit Judge, and JAMESON*, District Judge.
 
 JAMESON, District Judge:
 
 10
 The seven appellants were convicted, following a jury trial, of conspiracy (Count I) and the operation of an illegal gambling business (Count II), in violation of 18 U.S.C. §§ 371 and 1955.[1] Upon consideration of the numerous alleged errors urged by the appellants, we find no reversible error and affirm.
 
 Facts
 
 11
 On September 30, 1971, Assistant United States Attorney Dempsey presented to Judge Joseph Lieb of the United States District Court for the Middle District of Florida an application for electronic surveillance of three telephones suspected to be involved in illegal gambling operations headquartered at 801 East Jean Street in Tampa, Florida. The application was based on information supplied by four confidential informants who were bettors or observers of the illegal gambling operation. Based on the information contained in the application and supporting affidavit, Judge Lieb authorized electronic interception of all gambling related conversations of "Steve Guggino, . . . Frank Vega, . . . and others as yet unknown" conducted over the three target telephones.
 
 
 12
 During the 15 day operative period of the order,[2] communications intercepted over the three telephones revealed the existence of a sports betting operation dealing primarily with football and baseball wagering. The Government's case, based on the intercepted telephone conversations and other evidence presented at the trial, established that Trafficante occupied a supervisory position in the gambling operation and served as a source for "line" information (odds). Below Trafficante in the hierarchy, Guggino and Vega managed the gambling enterprise and operated the Jean Street clearing house as partners. While Guggino and Vega would on occasion accept wagers from individual bettors, they generally disseminated line information to, and accepted bets from, a network of "writers",[3] acted as intermediaries between Trafficante and the writers, and coordinated "lay-off" betting.[4] Vaglica, Castellano, and Alfonso were writers, accepting bets from individual bettors and channeling them to Guggino and Vega. Figueredo was an independent bookmaker who acted as a lay-off bettor for the Trafficante operation and exchanged line information with Guggino and Vega.
 
 
 13
 The Government presented its case primarily by playing tape recordings of the intercepted conversations, identifying the voices thereon, and then having an expert explain the significance of the conversation in the context of gambling. Some of the tapes, which contained conversations conducted in foreign languages, were translated into English by an interpreter. Transcripts were made of the translations which were read at trial following the playing of the tapes. Also produced as witnesses were individuals who had placed bets with several of the appellants.
 
 
 14
 At the conclusion of the eighteen day trial, the jury convicted all appellants on both counts. Appellants were sentenced to prison terms of varying duration.
 
 Issues on Appeal
 
 15
 The issues raised by the various appellants may be summarized as follows:
 
 
 16
 (1) Did the Government comply with the provisions of Title III of the Omnibus Crime Control and Streets Act of 1968, 18 U.S.C. § 2510, et seq?
 
 
 17
 (2) Is the Florida anti-wagering statute unconstitutionally vague?
 
 
 18
 (3) Were appellants entitled to separate trials?
 
 
 19
 (4) Was the admission of John Ambler's identification testimony of Trafficante's voice proper in all respects?
 
 
 20
 (5) Did the court properly instruct the jury in its main and supplemental charges?(6) Were the court's various evidentiary and procedural rulings correct?
 
 
 21
 (7) Did the court err in having various portions of the record reread to the jury?
 
 
 22
 (8) Was the evidence sufficient to support the convictions?
 
 Title III Compliance
 Requirements of 18 U.S.C. § 2518(1)(c)
 
 23
 18 U.S.C. § 2518(1)(c) requires that an application for an order authorizing the interception of wire or oral communications must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . .."
 
 
 24
 Prior to trial, Trafficante moved to suppress evidence seized pursuant to the intercept application and order alleging, among other violations, that "(t)he application did not contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they were unlikely to succeed if tried". Trafficante contends that denial of his motion was error, citing United States v. Kalustian, 529 F.2d 585 (9 Cir. 1976). The Ninth Circuit there found an affidavit insufficient which recited an F.B.I. agent's conclusion that because of difficulties in securing evidence in previous gambling cases, interception of the telephone communications of a suspected gambling organization was the "only available method of investigation" likely to secure sufficient evidence to obtain a conviction. Because alternative investigative procedures had not been tried and because the Government had failed to show why investigative problems in the case were any different "in nature or degree from any other gambling case", the court held that the requirements of § 2518(1)(c) had not been fulfilled.
 
 
 25
 In reviewing the sufficiency of the affidavit here, it must be noted that the purpose of section 2518(1)(c) "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques". United States v. Pacheco, 489 F.2d 554, 565 (5 Cir. 1974), cert. denied, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). Furthermore, the statute contemplates that " the showing be tested in a practical and commonsense fashion". S.Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2190.
 
 
 26
 Viewed in light of these principles, we conclude that the affidavit filed by Special F.B.I. Agent Kinne in conjunction with the intercept application satisfied the requirements of § 2518(1)(c). Both the application and the affidavit stated that normal investigative techniques were unavailing. The affidavit disclosed an active investigation of the gambling operation spanning a period of four months, during which F.B.I. agents had conducted physical surveillance of the Jean Street clearing house. In spite of this investigation, there were no witnesses "who could be relied upon to testify", and the informants had refused to testify. Agent Kinne, who had "investigated matters relating to organized crime" for over four years and was familiar with gambling operations, further averred that execution of a search warrant was unlikely to implicate the "major controllers" of the gambling operation. Due to the "clandestine" nature of the operation, only wiretapping offered a " reasonable likelihood" of securing evidence necessary to prove the gambling violations and to apprehend the top figures of the organization.[5] Viewed in a commonsense manner, these allegations were sufficient to establish that traditional investigative techniques had been tried and failed, and were not reasonably likely to succeed if tried.
 
 
 27
 The decision in Kalustian does not persuade us to reach a contrary conclusion. Unlike the affidavit in that case, the affidavit here established that conventional investigative techniques had been tried and were unsuccessful. The affidavit did not, as in Kalustian, rely on mere conclusions of the affiant based only on the affiant's "knowledge and experience" in investigating other gambling cases. Rather, this affidavit recited specific instances in the investigation of this case where normal techniques had been unfruitful. Kalustian is distinguishable.
 
 
 28
 Moreover, subsequent to Kalustian, the Ninth Circuit has considered the sufficiency of affidavits to support applications for wiretap interception in a number of cases,[6] most recently in United States v. Spagnuolo, decided March 4, 1977, 549 F.2d 705. In an exhaustive and well considered opinion citing decisions of the Ninth and other circuits subsequent to Kalustian, the court said in part:
 
 
 29
 "These decisions permit us to make the following observations. To show that 'other investigative procedures have tried and failed' the affidavit must reveal that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve their ends. The good faith effort need not have exhausted all possible uses of ordinary techniques. What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time."
 
 
 30
 The motion to suppress was properly denied.
 
 Requirements of § 2518(8)(d)
 18 U.S.C. § 2518(8)(d) requires that:
 
 31
 "(d) Within a reasonable time but not later than ninety days after the filing of an application for an order of approval under section 2518(7)(b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of
 
 
 32
 (1) the fact of the entry of the order or the application;
 
 
 33
 (2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and
 
 
 34
 (3) the fact that during the period wire or oral communications were or were not intercepted."
 
 
 35
 The wiretap here was authorized on September 30, 1971, for a period of 15 days and was extended for an additional 15 days on October 15. Judge Krentzman[7] on December 27, 1971, granted a 30 day extension of time for service of notice required by § 2518(8)(d) and granted a further 15 day extension on January 24, 1972.
 
 
 36
 During the operative period of the wiretap orders, Assistant United States Attorney Dempsey made written reports every five days to Judge Lieb and then to Judge Krentzman concerning information obtained on the wiretaps. Dempsey discussed in detail with the judges the individuals who were overheard and identified.[8] On February 4, 1972, Dempsey informed Judge Krentzman of the persons who were named in the indictment returned February 1, but requested the judge to limit inventory notice to those who were named in the wiretap order Vega and Guggino. Due to problems within the Department of Justice regarding its wiretap authorization procedures, it was anticipated that arrests pursuant to the indictment would not be made for some time, which prompted the request for limited notice to minimize the potential for flight of those indicted. Judge Krentzman complied with the request, and on February 7, 1972, notice was served on Vega and Guggino.
 
 
 37
 Only Vega and Guggino were required by statute to receive inventory notice, since they were named in the wiretap order. Vega contends that he was not served with notice of the September 30 and October 15 wiretaps, but received notice only of a spin-off wiretap. At a suppression hearing, the deputy United States Marshal charged with serving the notice testified that on February 7, 1972, he served copies of four inventory notices on Vega, one of which concerned the September 30 wiretap. A return copy of the notice of the September 30 wiretap was received in evidence, showing that it had been served on Vega on February 7. This factual issue was determined against Vega by the district court.
 
 
 38
 The remaining appellants were not named in the September 30 order, but their conversations were overheard. Although service of notice on unnamed but overheard individuals is discretionary with the issuing judge, appellants moved to suppress the wiretap evidence, contending that they should have been served with notice. The motion to suppress was denied. On appeal, appellants contend that Fourth Amendment protections require that notice be given to unnamed but overheard persons "promptly after the decision to obtain an Indictment has been made", citing United States v. Chun, 503 F.2d 533 (9 Cir. 1974). Appellants further argue that the Government's request for limited service of notice created a violation of Title III. Finally, it is argued that although appellants received the inventory order during discovery, this was not a unilateral notice as required by § 2518(8)(d).
 
 
 39
 We begin our review of appellants' contentions with a consideration of the Fourth Amendment issue. The Ninth Circuit in United States v. Chun, supra at 537, relied on by appellants, stated:
 
 
 40
 "(W)e point out that the unnamed but overheard are also entitled to Fourth Amendment protection. Specifically, we believe that when the government intends to use the contents of an interception or evidence derived therefrom, to obtain an indictment against an unnamed but overheard individual, such individual must be given notice promptly after the decision to obtain an indictment has been made." 503 F.2d at 537.[9]
 
 
 41
 But the court went on to note that "(i)n this context, the determination of what constitutes 'promptly' should focus on whether the individual has been afforded a reasonable opportunity to prepare an adequate response to the evidence which has been derived from the interception." 503 F.2d at 538.
 
 
 42
 The Eighth Circuit in United States v. Wolk, 466 F.2d 1143 (1972) held that suppression of wiretap evidence was not required on either constitutional or statutory grounds merely because inventory notice had not been served on unnamed and overheard individuals, where those individuals "had actual notice of the interceptions and were not prejudiced". The unnamed persons, although receiving no statutory inventory notice, were informed of the wiretap at arraignment and were thereafter allowed complete access to the tapes and transcripts. In reaching its conclusion, the court said:
 
 
 43
 "To us the statute is concerned with adequate notice and not formalities. The record demonstrates that the appellees were sufficiently aware of the wiretap so as to be able to seek suppression of the evidence on a number of grounds . . .. The appellees had adequate notice in this case, and they have not shown that any prejudice resulted from the failure of the Government to formally serve them with the inventories." 466 F.2d at 1146.
 
 
 44
 We agree with these circuits that in the wiretap context, Fourth Amendment requirements are substantially satisfied where actual notice is provided to unnamed but overheard individuals in time for them to adequately prepare a defense. We conclude that appellants received such notice here. The original indictment[10] was returned on February 1, 1972, and appellants were arrested on March 2, 1972, when they were orally informed of the wiretaps. On September 14, 1972, appellants were sent written inventory notices " comparable in content to those envisioned by § 2518(8)(d)", and no later than January 4, 1973, transcripts of all intercepted conversations were made available to appellants. The suppression hearing was not held until April, 1975 allowing appellants ample time to prepare their defense. In these circumstances, we find no Fourth Amendment violation.
 
 
 45
 Aside from the constitutional issue is the question of Government violation of Title III statutory requirements. First, consideration must be given to whether the district court was afforded an opportunity to exercise an informed discretion. This question was recently addressed by the Supreme Court in United States v. Donovan, --- U.S. ----, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). The Court there noted that, "In deciding whether legitimate privacy interests justify withholding inventory notice from parties to intercepted conversations, a judge is likely to require information and assistance beyond that contained in the application papers and the recordings of intercepted conversations made available by law enforcement authorities." 97 S.Ct. at 669. The Court adopted the Ninth Circuit requirement that the Government must inform the district court of "the general class, or classes", of "(individuals) whose conversations have been intercepted", but also stated that where "the Government chooses to supply the issuing judge with a list of all identifiable persons rather than a description of the classes into which those persons fall, the list must be complete." 97 S.Ct. at 670. We conclude that the Government satisfied this requirement. Assistant United States Attorney Dempsey testified that he informed the district court of "every single person . . . who had been identified during the course of this investigation". There was further testimony that background information on these people was furnished to the court. This was sufficient for the court to exercise an informed discretion. We do not face the problem present in Chun and Donovan of the failure of the Government to inform the district court of the identity of persons whose conversations were intercepted.
 
 
 46
 The Government's request for limited notice did not violate any provision of Title III since the district court was in a position to exercise its informed discretion. Similarly, the failure of the Government to send formal inventory notice to appellants did not constitute a statutory violation. Notice to appellants, who were unnamed in the wiretap order, rested within the sound discretion of the court, which was properly exercised. In any case, appellants received actual notice. As the court in Wolk, supra at 1146, said, "We do not believe that the use of formal inventories is an end unto itself. Surely neither the Congress nor the constitution would require such emphasis of form over substance . . .." See also United States v. Donovan,supra, 97 S.Ct. at 674, fn. 26. We find no statutory violations of Title III. Even were we to agree with appellants' argument, suppression of the wiretap evidence would not be required since "postintercept notice was (not) intended to serve as an independent restraint on resort to the wiretap procedure". United States v. Donovan, supra at 674.
 
 
 47
 Vaglica independently contends that he was not served with post-termination inventory notice, as ordered by the district court. However, the order did not relate to the interception here, but to a wiretap order approved on November 12, 1971. As noted supra, all evidence seized under the November 12 order was suppressed under Giordano.
 
 Florida Anti-Wagering Statute
 
 48
 Pursuant to 18 U.S.C. § 1955, which defines an illegal gambling business as one which "is a violation of the law of a state . . . in which it is conducted", the indictment charged that the appellants' gambling was in violation of § 849.14, Florida Statutes Annotated (1965).[11] Vega, joined by the other appellants, argues that this statute is so "overbroad, vague and indefinite" that it "fails to apprise the public of the specific act or acts prohibited". Appellants do not attempt to bring their own activities within the scope of this argument, but rather argue that some hypothetical persons might be improperly ensnared by the statute.
 
 
 49
 In view of appellants' failure to bring their own conduct within the alleged constitutional deficiencies of the statute, they are precluded from attacking the statute on grounds of vagueness and overbreadth. As the Supreme Court stated in United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960): " . . . one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional."
 
 
 50
 Moreover, we find no merit in appellants' contention. As this court noted in United States v. Pacheco, 489 F.2d 554, 564 (1974) cert. denied, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975), while gambling is not specifically defined in the statute, it is clear that "gambling" is used in its generic sense. We can perceive no possibility of including the hypothetical persons suggested by appellants as potential violators under any reasonable construction of the statute.
 
 Motions for Severance
 
 51
 It is contended in Guggino's brief that the court erred in denying numerous motions for severance made during the course of the trial pursuant to Rule 14, F.R.Crim.P. Appellants argue in general terms that they were " prejudiced by evidence not admissible to them individually" and the "court's many cautionary instructions were inadequate" for the jury "to distinguish the alleged acts of one co-defendant from the other". We do not agree. The court was careful throughout the trial and in its charge to the jury to make it clear that the evidence should be considered separately as to each defendant. Appellants have failed to show "likelihood of prejudice" in the joint trial. The court did not abuse its discretion in denying their motions to sever. See United States v. Crockett, 514 F.2d 64, 70 (5 Cir. 1975).
 
 
 52
 Trafficante argues that he should have been granted a severance to permit Guggino to give exculpatory testimony at a separate trial. Trafficante submitted, with his severance motion, an affidavit of Guggino in which Guggino asserted that he would testify at a separate trial of Trafficante but not at their joint trial. He averred that he would testify that Trafficante was not the party to whom he spoke in intercepted telephone conversations and that he would deny that several surveilled meetings with Trafficante were related to illegal gambling.
 
 
 53
 Both sides rely on Byrd v. Wainwright, 428 F.2d 1017 (5 Cir. 1970), which established guidelines for the granting of a severance where possible exculpatory evidence could be presented by a co-defendant. As this court noted in United States v. Cochran, 499 F.2d 380, 392 (1974) cert. denied, 419 U.S. 1124, 95 S.Ct. 810, 42 L.Ed.2d 825 (1975), the "Byrd guidelines provided that (1) the testimony must be exculpatory in effect; (2) the testimony must be more than purely cumulative, or of negligible weight or probative value; and (3) there must be a likelihood that the co-defendant will be willing to testify if the defendant is tried separately."
 
 
 54
 Trafficante argues that all of these conditions were satisfied. In Byrd, however, the court also recognized that the trial judge may "make inquiry into the credibility or weight of the potential testimony of the codefendant" and "is not required to sever on patent fabrication". 428 F.2d at 1021.
 
 
 55
 In United States v. Alejandro, 527 F.2d 423, 428 (5 Cir. 1976) cert. denied, 429 U.S. 844, 97 S.Ct. 124, 50 L.Ed.2d 115, it was recognized that the trial judge may also consider whether the testimony of the codefendant is "contrary to his own penal interest". There the codefendant had been "caught redhanded" and the court noted: "His effort to absolve his co-defendant cost him nothing. It is not unusual under such circumstances for the obviously guilty defendant to try to assume the entire guilt."
 
 
 56
 We have a comparable situation here. There was no real question of Guggino's guilt. He had nothing to lose by exculpating Trafficante and could perhaps be rewarded. The evidence which corroborated Ambler's identification of Trafficante's voice on the tapes also casts doubt on the credibility of Guggino's proffered testimony.
 
 
 57
 Under the circumstances the trial judge did not abuse his discretion in denying the motions for severance.
 
 Ambler's Voice Identification Testimony
 
 58
 John Ambler was called by the Government to identify Trafficante's voice on certain tape recordings. In 1971 Ambler was a F.B.I. agent engaged in the investigation of the gambling operations. He had heard Trafficante's voice on some ten occasions. At the time of trial Ambler had retired from the F.B.I. and was employed by Trafficante's attorney as a private investigator. He was reluctant to testify, and as the judge found in an in camera hearing, "would if he (could) tell as little and forget as much as possible". Called by the Government, Ambler testified to two occasions on which he identified Trafficante's voice. On cross-examination the defense elicited testimony that he was not positive of the identification. The court then declared Ambler a hostile witness and permitted the Government to elicit from Ambler that he had been retained by Trafficante's attorney as a private investigator. The Government also called three F.B.I. agents to testify to Ambler's positive identification of Trafficante's voice on November 1, 1971.
 
 
 59
 In contending that Ambler's testimony should not have been admitted, Trafficante argues, inter alia, that Ambler's testimony violated the attorney-client privilege, there was insufficient predicate for the testimony, and it was cumulative of other testimony. We find these contentions without merit. There was no evidence that Ambler had participated with Trafficante's attorney in the investigation or preparation of the case or had received any confidential information from the attorney, so that no violation of the attorney-client privilege is presented. Sufficient foundation was laid for Ambler's testimony when he stated he had heard Trafficante's voice some ten times. That other witnesses were available to provide identification is immaterial, particularly in view of the fact that Ambler was the agent most familiar with Trafficante's voice.
 
 
 60
 Trafficante contends further that the court abused its discretion in treating Ambler as a hostile witness and permitting his impeachment based on his relationship with Trafficante's counsel. The common law rule prohibiting a party from impeaching his own witness "bears little present relationship to the realities of the criminal process". Chambers v. Mississippi, 410 U.S. 284, 296, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973).[12] In any event, in view of Ambler's reluctance to testify and evasiveness in his testimony, we conclude that the court did not err in declaring him a hostile witness and allowing impeachment through evidence of his present employment.
 
 
 61
 Finally, Trafficante contends that the court erred in allowing the three F.B.I. agents to testify with respect to Ambler's positive identification of Trafficante's voice on November 1, 1971. This evidence was properly admitted for impeachment purposes. A limiting instruction would have been proper had appellant requested it; but no request was made. The failure to give the instruction sua sponte was not reversible error. United States v. Hill, 481 F.2d 929, 932 (5 Cir. 1973), cert. denied, 414 U.S. 1115, 94 S.Ct. 847, 38 L.Ed.2d 742 (1974).
 
 Jury Instructions
 
 62
 Appellants first contend that the court erred in failing to instruct the jury that the defendants must be aware that the conspiracy must involve at least five participants. It is well settled, however, that the "five persons" criterion of § 1955 is a jurisdictional requirement unrelated to the criminal character of conduct. United States v. Pacheco, 489 F.2d 554, 558 (5 Cir. 1974); United States v. Tucker, 526 F.2d 279, 283-284 (5 Cir. 1976) cert. denied, --- U.S. ----, 97 S.Ct. 796, 50 L.Ed.2d 783 (1977). The argument here advanced by appellants was rejected by the Sixth Circuit in an exhaustive opinion in United States v. Leon, 534 F.2d 667, 674-675 (6 Cir. 1976). We conclude that the district court did not err in refusing to give the requested instruction.
 
 
 63
 Nor is there merit in appellants' contention that the court erred in refusing to instruct the jury that the Florida gambling statutes do not apply to pari-mutuel wagering. There was no evidence suggesting that the gambling operation of appellants fell within the requested instruction. The instructions given were proper and adequate.
 
 Evidentiary and Procedural Rulings
 Disclosure of Confidential Informants
 
 64
 Appellant Alfonso contends that the court erred in denying his motion for disclosure of the identity of four confidential informants. He relies primarily on Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957), where the Court held: "Where the disclosure of an informant's identity, or of the contents of his communications, is relevant to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." The Court continued:
 
 
 65
 "We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstance of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S. at 60, 61-62, 77 S.Ct. at 628. See also McCray v. Illinois, 386 U.S. 300, 310-312, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).
 
 
 66
 Under the circumstances of this case, disclosure was not required. There is no evidence that the informants had participated in the activities for which Alfonso was charged or that evidence described by the informants was introduced at the trial. Nor is there any evidence that the informants implicated Alfonso. The district court did not err in denying Alfonso's motion for disclosure of the identity of the informants.
 
 Agent Harker's Testimony
 
 67
 Philip Harker, who was qualified as an expert in bookmaking and gambling, testified with respect to the meaning of gambling jargon contained in intercepted telephone conversations and the role of the appellants in the gambling operation. Appellants argue that this testimony wrongly invaded ultimate issues of fact to be determined by the jury. By reason of the cryptic nature of the recorded conversations, often framed in jargon peculiar to the gambling trade, it was appropriate to present expert testimony to supply meaning to the conversations and explain the roles of the appellants. See United States v. Cirillo, 499 F.2d 872, 881 (2 Cir. 1974), cert. denied, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974).
 
 Aliases
 
 68
 The second superseding indictment referred to appellants by their proper names, as well as by aliases used by appellants to identify each other in the taped telephone conversations. Appellants argue that the use of the aliases in the indictment invaded the jury's province of identification of the voices on the tape. The aliases were extensively used in the intercepted conversations, and there was ample testimony to identify the appellants with the various aliases. Under these circumstances the court did not err in denying appellants' motion to strike the aliases. See United States v. Skolek, 474 F.2d 582, 586 (10 Cir. 1973); United States v. Miranda, 494 F.2d 783, 788 (5 Cir. 1974).
 
 Rereading Evidence to Jury
 
 69
 After beginning its deliberations, the jury requested the court to replay the taped conversations of Trafficante and Figueredo. To prevent the jury from "ferreting out of context" certain evidence, the court ordered the tapes to be replayed for the jury together with the rereading, from the court reporter's notes, of testimony of witnesses relating to the matters discussed on the tapes. Appellants contend that they were prejudiced by the rereading of the evidence, both because of its excessive length[13] and because the evidence which was reread was slanted in favor of the Government.
 
 
 70
 It is well settled that a trial judge has broad discretion in responding to a jury request that certain evidence be reread. Pinckney v. United States, 352 F.2d 69 (5 Cir. 1965). As stated in the ABA Standards Relating to the Administration of Criminal Justice, Trial by Jury § 5.2(b) (1968):
 
 
 71
 "The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested."
 
 
 72
 The rereading procedure followed here evinces a concerted effort by the court to insure that the evidence requested by the jury was presented in a fair and complete manner and placed in its proper context.[14] The evidence reread was closely related to the material requested by the jury, and the manner of its presentation indicated the court's complete impartiality. See United States v. Gentile, 525 F.2d 252, 260-261 (2 Cir. 1975), cert. denied, 425 U.S. 903, 96 S.Ct. 1493, 47 L.Ed.2d 753 (1976). The extreme length of the rereading proceedings does not indicate prejudice per se ; nor do we find any evidence of prejudice in the record as recounted by appellants.
 
 
 73
 Neither do we find that the evidence reread unfairly favored the Government, as Trafficante contends. At the beginning of the rereading, the court stated that it would allow the rereading of a portion of the Government's case against Trafficante and "then move to the two defense witnesses who dealt with the voice identification of Henry Trafficante". At a later side bar conference, Trafficante's attorney advised the court that "out of the defense witnesses, the only part he wishe(d) to have done in connection with Mr. Trafficante (was) the short examination of Mr. Kinne" relating to a November 1, 1971, meeting. Thereafter, the court stated that while it would not reread Kinne's testimony, it would "play the two proffers which (went) strictly to the Ambler capability of identifying (Trafficante's) voice . . . ." In view of this, appellants' arguments that the trial court skewed the reread evidence in favor of the Government is not well taken. We find that the court properly exercised its discretion in rereading certain evidence to the jury.[15]
 
 Record of Rereading
 
 74
 Appellants also contend that the court erred in failing to make a record of the rereading. 28 U.S.C. § 753(b)(1) requires that a court reporter attend each session of district court and record "all proceedings in criminal cases had in open court". Upon a review of the record we find that the court carefully explained to the jury the procedure to be followed in response to its request for the Trafficante tape. A record was made of numerous objections and motions of counsel outside the presence of the jury, colloquy between court and counsel, and the rulings of the court.
 
 
 75
 Appellants contend, however, in a "Supplemental Affidavit" and supporting argument filed subsequent to oral argument, that the district court erroneously failed to make a record of the rereading of the evidence, objections, comments of counsel, and court rulings made in open court in the course of the rereading. Specifically the affidavit states that appellants offered a daily copy of the testimony prepared by a state court reporter; that the court sustained the Government's objection to the use of that transcript, and held that only the notes of the official court reporter be read; that there were discrepancies between the notes of the two reporters, and objections were made by counsel for appellants and overruled by the court. While these proceedings are not shown in the transcript of the record, appellants have failed to show they were prejudiced by their omission.[16] In any event, the district court properly relied on the notes of the official court reporter.
 
 
 76
 It is true, as appellants contend, that the cases are uniform in holding that the requirements of 28 U.S.C. § 753(b) are "mandatory, not permissive". See, e. g., Calhoun v. United States, 384 F.2d 180, 183 (5 Cir. 1967). The cases also agree, however, that failure to comply with the statute does not constitute prejudicial error per se. See, e. g., Strauss v. United States, 311 F.2d 926 (5 Cir. 1963), cert. denied, 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963). Rather, as this court stated in United States v. Long, 419 F.2d 91, 94 (1969): ". . . in order to require reversal, some specific error or prejudice resulting from failure to record such proceedings must be called to the Court's attention". The rationale behind this requirement was stated by this court in Addison v. United States, 317 F.2d 808, 811 (1963): "Obviously even though a failure of the court reporter to report the arguments of counsel were an error per se, such error would not be available to appellants to work a reversal without a showing that it was prejudicial error. Rule 52(a) F.R.Crim.Proc."
 
 
 77
 Nowhere, either in their briefs or in their Supplementary Affidavit, do appellants specify any prejudice arising from the court's failure to require all of the court proceedings to be recorded. "This fact alone destroys appellants(') position, Addison v. United States, supra at 811, and distinguishes the present case from those in which this Court has reversed convictions for failure to record proceedings." United States v. Long, supra at 94.[17]
 
 
 78
 Nor do we find any merit in the contention of appellant Vega that the reinstruction of the jury following the rereading of the evidence was confusing or improper.[18]
 
 Sufficiency of Evidence
 Gross Revenue
 
 79
 Appellants argue that the Government failed to show that their gambling operations had a gross revenue of $2,000 in any single day. F.B.I. Agent Harker, however, testified that based upon the intercepted conversations, he calculated that the daily receipts of the enterprise on October 2, 9, and 10, 1971 were $15,569.00, $2,225.00 and $12,897.00 respectively. This testimony was sufficient to establish the statutory element of "gross revenue". See United States v. Sacco, 491 F.2d 995, 1001 (9 Cir. 1974) (en banc).Trafficante
 
 
 80
 Trafficante attacks the sufficiency of the evidence upon the supposition that the recorded interception of his conversations was inadmissible. We have held, supra, that these recordings were properly admitted and that F.B.I. Agent Ambler's identification of Trafficante's voice was sufficient. Other evidence corroborated this identification. In particular, Trafficante and Guggino were observed meeting following a recorded telephone conversation in which the caller and Guggino agreed to meet at that time and place. The evidence as a whole was sufficient to sustain Trafficante's conviction.
 
 Figueredo
 
 81
 Figueredo contends that his gambling operation was separate from that of Trafficante, precluding prosecution under 18 U.S.C. § 1955, which requires participation by five or more persons. The proof, however, established a nexus between the gambling operations of Trafficante and Figueredo. The evidence showed that Figueredo regularly accepted lay-off bets from the Trafficante operation. As this court held in United States v. Joseph, 519 F.2d 1068, 1071 (1975), it was the intent of Congress in enacting § 1955 to include all persons who participate in the operation of a gambling business, including lay-off bettors, and to exclude only customers of the business.
 
 Conclusion
 
 82
 We find no reversible error and affirm the convictions of all of the defendants.
 
 
 
 *
 Senior District Judge of the District of Montana, sitting by designation
 
 
 [1]
 18 U.S.C. § 1955 provides in pertinent part:
 "(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 "(b) As used in this section
 (1) 'illegal gambling business' means a gambling business which
 "(i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."
 
 
 [2]
 The wiretap authority terminated on October 14, 1971, but was extended for fifteen days by order of the court on October 15. Evidence obtained under the extension of the wiretap and all subsequent wiretap orders was not used by the Government. The evidence was suppressed under the holding of United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) since the extension and later orders were not approved by either the Attorney General or a designated assistant attorney general
 
 
 [3]
 A "writer" is an agent of a bookmaker who accepts bets from individuals and funnels them to the bookmaker
 
 
 [4]
 "Lay-off" bets are bets between bookmakers made in an effort to reach a mutually favorable balance in each bookmaker's bets. Because a bookmaker charges a losing bettor a commission (usually ten percent), it is to his advantage to place an even amount of wagers on both sides of a contest so that regardless of who wins, the bookmaker receives a ten percent net profit. In order to achieve this equilibrium, bookmakers engage in lay-off betting with one another
 
 
 [5]
 The affidavit stated, in pertinent part:
 "The interception of these criminal conversations is necessary because:
 "1. All of the confidential informants have refused to testify in open court and without their testimony, it would be impossible to obtain evidence of this illegal business.
 "2. If a search warrant were executed, it could result in the seizure of gambling records; however, it would probably not tie in the major controllers of this gambling organization.
 "3. There are no known witnesses who could be relied upon to testify to these violations.
 "4. Due to the clandestine manner in which this betting operation is carried out, the interception of these communications is the only available means of investigation which has a reasonable likelihood of securing the evidence necessary to prove the commission of these violations as well as providing evidence implicating the men who are the top controllers of this illegal gambling business."
 
 
 [6]
 Including United States v. Kerrigan, 514 F.2d 35 (9 Cir. 1975) cert. denied, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975) and United States v. Feldman, 535 F.2d 1175 (9 Cir. 1976), where the Ninth Circuit upheld the validity of affidavits similar to the one here
 
 
 [7]
 Upon Judge Lieb's death on November 1, 1971, Judge Krentzman took over the case. Judge Krentzman supervised the bulk of the wiretap investigation
 
 
 [8]
 Regarding his discussions with Judge Krentzman, Dempsey testified at the suppression hearing:
 "We discussed every single person who was a subject who had been identified during the course of this investigation, who had been identified as participating in the particular operation."
 "He wanted to know the personality the people involved, where they resided, what information we had as to their activities."
 "I made it a point in my conversations with Judge Krentzman to bring to the attention of Judge Krentzman each of the individuals named in the in Mr. Kinne's reports."
 Dempsey also had detailed discussions with Judge Krentzman about other aspects of the operation:
 "We discussed at great length, the law. I remember that. He (Judge Krentzman) took a great deal of time in reviewing my application, as well as the prior applications and the prior orders and the affidavits of the agents."
 "We discussed the locations. We even discussed how the monitoring was being accomplished, where it was being accomplished, what cooperation the General Telephone Company was providing to us, what languages were being employed."
 
 
 [9]
 On remand, the district court concluded as to the Fourth Amendment issue:
 " . . . I conclude that a conscious decision not to notice an unnamed but overheard individual who was known to be tapped for indictment could not withstand constitutional scrutiny. If, as held on appeal herein, the unnamed but overheard defendant has a Fourth Amendment right to privacy of the same dimensions as that of a named defendant, post-use notice of a wiretap is required, and a failure to give such notice would render the overheard communication unlawfully intercepted within the meaning of § 2518(10)(a)." United States v. Chun, 386 F.Supp. 91, 95-96 (D.Haw.1974).
 
 
 [10]
 This indictment was twice superceded. Appellants were tried on the second superceding indictment, which was returned on April 21, 1972
 
 
 [11]
 Fla.Stat.Ann., § 849.14 provides:
 "Whoever stakes, bets or wagers any money or other thing of value upon the result of any trial or contest of skill, speed or power or endurance of man or beast, or whoever receives in any manner whatsoever any money or other thing of value staked, bet or wagered, or offered for the purpose of being staked, bet or wagered, by or for any other person upon any such result, or whoever knowingly becomes the custodian or depositary of any money or other thing of value so staked, bet, or wagered upon any such result, or whoever aids, or assists, or abets in any manner in any such acts all of which are hereby forbidden, shall be guilty of gambling, and shall be punished by imprisonment not exceeding six months or by fine not exceeding five hundred dollars."
 
 
 [12]
 Rule 607, F.R.Evid., which became effective subsequent to the trial of this case, specifically provides that, "The credibility of a witness may be attacked by any party, including the party calling him."
 
 
 [13]
 The rereading covered approximately one and one-half days of the trial
 
 
 [14]
 As the court stated prior to the actual rereading of the evidence:
 "We will do it like they (the jury) heard it in the first place . . . . I am not going to let it be done out of context, out of place, edited out or any other fashion.
 ". . . We will not distort the matter as it was presented to the Jury."
 
 
 [15]
 Appellants also contend that the court erred in refusing to allow them to make additional summations to the jury after the evidence had been reread. The court properly followed the format for final arguments set out in Rule 29.1, F.R.Crim.P. Appellants were not entitled to additional summations
 
 
 [16]
 The same is true of the allegations in the supplemental affidavit and argument with respect to the omission of other objections and comments of counsel during the rereading of the testimony
 
 
 [17]
 United States v. Selva, 546 F.2d 1173 (5 Cir. 1977), cited in appellants' supplemental argument, is distinguishable. There no record was made of counsel's argument, and the case was remanded for a hearing "for the purpose of supplementing the record, if possible, to disclose what transpired during the closing arguments at the trial". We find no basis in the affidavit and argument of appellants' counsel to require this procedure
 
 
 [18]
 The court instructed the jury, inter alia, that "Count I of the indictment further alleges that the defendants would use these means to carry out their conspiracy". (Emphasis added.) The court then specified the allegations with respect to the participation of each of the appellants without repeating the reference to Count I. The use of the phrase "these means" manifestly refers to the allegations thereafter set forth with respect to the various defendants